NO. 26-3709, 26-3712, 26-3714

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ABBVIE INC., et al,

Plaintiffs-Appellants,

v.

NICK BROWN, et al.,

Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

No. 3:26-cv-05302-DGE
The Honorable David G. Estudillo, United States District Court Judge

APPELLEES' OMNIBUS RESPONSE BRIEF

NICHOLAS W. BROWN
Attorney General

ALIANA KNOEPFLER, WSBA #64738
JULIE MORONEY, WSBA #59017
Assistant Attorneys General
WILLIAM MCGINTY, WSBA #41868
KELLY A. PARADIS, WSBA #47175
Deputy Solicitors General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188

206-464-7744
aliana.knoepfler@atg.wa.gov
julie.moroney@atg.wa.gov
william.mcginty@atg.wa.gov
kelly.paradis@atg.wa.gov

*Counsel for Defendants-Appellees*
*Nick Brown and Ryan Moran*

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................1

II.   STATEMENT OF THE ISSUE....................................................3

III.  STATEMENT OF THE CASE .........................................................4

    A.  The Federal 340B Program: A Safety Net for
        Safety-Net Providers .......................................................4

    B.  Contract Pharmacies Are Necessary for 340B
        Drug Distribution ........................................................7

    C.  Drug Manufacturers' Current Restrictions................................12

    D.  Washington Responds to Restrictive Manufacturer
        Policies .............................................................13

IV.  SUMMARY OF ARGUMENT.........................................................15

V.   STANDARD OF REVIEW ..............................................................17

VI.  ARGUMENT............................................................................18

    A.  SB 5981 Does Not Violate the Supremacy Clause ....................18

        1.  SB 5981 is not barred by intergovernmental
            immunity ........................................................21

            a.  SB 5981 does not directly regulate the
               federal government .....................................22

            b.  SB 5981 does not discriminate against the
               federal government or those with whom it deals .........23

        2.  SB 5981 is not preempted....................................30

            a.  The presumption against preemption applies................30

i

  b. Congress has not occupied the field under any definition ................................................34

   i. There is no dominant federal interest ...........................35

   ii. There is no pervasive regulation.................................38

   iii. Spending Clause legislation does not have greater preemptive effect .............................................41

  c. There is no conflict preemption.....................................44

   i. SB 5981 regulates activities that federal law does not...................................................................45

   ii. SB 5981 does not invite conflicting adjudications ..............................................................49

   iii. SB 5981 does not obstruct 340B audits.......................55

   iv. SB 5981 is not an obstacle to Medicaid and Medicare ............................................................60

   v. The United States' amicus brief is unpersuasive for the same reasons.....................................................60

B. SB 5981 Is Not a Taking ...........................................................61

 1. AbbVie's voluntary participation in the 340B program defeats its takings claim .........................................62

 2. Washington's law does not compel AbbVie to sell its drugs ........................................................................65

 3. Washington's law serves a public use ................................66

C. The Dormant Commerce Clause Does Not Bar SB 5981 ..........66

D.  Appellants Have Not Met Their Burden to Show Irreparable Harm .......................................................................................69

E.  The Balance of the Equities and the Public Interest Weigh Against an Injunction ...............................................................70

VII.  CONCLUSION..............................................................................73

# TABLE OF AUTHORITIES

<u>Cases</u>

*AbbVie, Inc. v. Brown*,
  809 F. Supp. 3d 1341 (D. Utah 2025) ............................................................ 66

*AbbVie, Inc. v. Drummond*,
  808 F. Supp. 3d 1266 (W.D. Okla. 2025) ...................................................... 54

*AbbVie, Inc. v. Fitch*,
  152 F.4th 635 (5th Cir. 2025)............................................ 18, 31, 37, 38, 50, 65

*AbbVie, Inc. v. Murrill*,
  Nos. 24-30645, 24-30651, 24-30673, 2026 WL 1947948
  (5th Cir. July 6, 2026) ...................................................... 18, 31, 35, 42, 50, 52

*AbbVie, Inc. v. Skrmetti*,
  No. 3:25-cv-00519, 2026 WL 542712 (M.D. Tenn. Feb.
  26, 2026)........................................................................................................ 53

*AbbVie, Inc. v. Weiser*,
  811 F. Supp. 3d 1264 (D. Colo. 2025) .......................................................... 21

*AbbVie, Inc. v. Wrigley*,
  2026 WL 1133457 (D.N.D. Apr. 27, 2026) .................................................. 54

*AIDS Healthcare Found. v. Douglas*,
  457 F. App'x 676 (9th Cir. 2011)............................................................. 40, 44

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008) ................................................................................... 15, 31

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................... 35, 38, 44, 49

*Armstrong v. Exceptional Child Care Ctr., Inc.*,
  575 U.S. 320 (2015) ...................................................................................... 18

*Ass'n for Accessible Meds. v. Ellison*,
140 F.4th 957 (8th Cir. 2025).................................................................. 69

*Ass'n for Accessible Meds. v. Frosh*,
887 F.3d 664 (4th Cir. 2018).................................................................. 69

*Associated Gen. Contactors of Cal., Inc. v. Coalition for Econ. Equity*,
950 F.2d 1401 (9th Cir. 1991).................................................................. 69

*Astra USA, Inc. v. Santa Clara County*,
563 U.S. 110 (2011) ................................................................. 6, 24, 36

*Astrazeneca Pharms. LP v. Frey*,
No. 1:25-cv-00495-JCN, 2026 WL 2145194 (D. Me. July 27, 2026).......... 18

*AstraZeneca Pharms. LP v. Lopez*,
No. 25-00369, 2026 WL 497141 (D. Haw. Feb. 23, 2026)
.................................................................. 21, 22, 24, 26, 27, 28, 37, 50

*Atl. Richfield Co. v. Christian*, 590 U.S. 1 (2020)........................................... 48

*Avenal Cmty. Health Ctr. v. Baass*,
No. 23-16109, 2024 WL 4441430 (9th Cir. Oct. 8, 2024)...................... 40, 44

*Ballinger v. City of Oakland*,
24 F.4th 1287 (9th Cir. 2022).................................................................. 66

*Barnes v. Gorman*,
536 U.S. 181 (2002) .................................................................. 42

*Barnett Bank of Marion Cnty. v. Nelson*,
517 U.S. 25 (1996) .................................................................. 46

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014).................................................................. 26

*Bond v. United States*,
572 U.S. 844 (2014) .................................................................. 19

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ...................................................................... 27, 38

*Buckman Co. v. Pls.' Legal Comm.*,
  531 U.S. 341 (2001) ............................................................................ 33

*CDK Global LLC v. Brnovich*,
  16 F.4th 1266 (9th Cir. 2021).......................................................... 44

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ........................................................................... 61

*Chae v. SLM Corp.*,
  593 F.3d 936 (9th Cir. 2010).............................................................. 38

*Chamber of Com. v. Whiting*,
  563 U.S. 582 (2011) ................................................... 16, 37, 45, 53

*Chinatown Neighborhood Ass'n v. Harris*,
  794 F.3d 1136 (9th Cir. 2015)............................................................ 39

*Citizens for Honesty & Integrity in Reg'l Plan. v. County of San Diego*,
  258 F. Supp. 2d 1132 (S.D. Cal. 2003) ........................................... 42

*City of Los Angeles v. AECOM Servs., Inc.*,
  854 F.3d 1149 (9th Cir. 2017)...................................................... 39, 45

*CoreCivic, Inc. v. Governor of N.J.*,
  145 F.4th 315 (3rd Cir. 2025) ........................................................... 27

*Crosby v. Nat'l Foreign Trade Council*,
  |530 U.S. 363 (2000) ........................................................................... 55

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022) ........................................................................... 42

*Davidson v. Sprout Foods, Inc.*,
  106 F.4th 842 (9th Cir. 2024)...................................................... 36, 52

iii

*Eng. v. Gen. Elec. Co.*,
  496 U.S. 72 (1990) ................................................................. 50

*Farris v. Seabrook*,
  677 F.3d 858 (9th Cir. 2012) ........................................... 17, 18

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ............................................................. 46

*Flynt v. Bonta*,
  131 F.4th 918 (9th Cir. 2025) ............................................. 67

*Forest Park II v. Hadley*,
  336 F.3d 724 (8th Cir. 2003) ............................................... 43

*Garcia v. San Antonio Metro. Transit Auth.*,
  469 U.S. 528 (1985) ............................................................. 19

*Gartrell Construction Inc. v. Aubry*,
  940 F.2d 437 (9th Cir. 1991) ............................................... 55

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000) ............................................................. 46

*GEO Grp., Inc. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) ................................... 20, 26, 33

*Goldie's Bookstore, Inc. v. Super. Ct. of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ............................................... 69

*Helfrich v. Blue Cross & Blue Shield Ass'n*,
  804 F.3d 1090 (10th Cir. 2015) ........................................... 32

*Hencely v. Fluor Corp.*,
  146 S. Ct. 1086 (2026) ........................................................ 45

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
  471 U.S. 707 (1985) ................................................... 35, 36, 45

iv

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015) ...................................................................... 61, 65

*In re Derailment Cases*,
  416 F.3d 787 (8th Cir. 2005) ............................................................ 41

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ......................................................................... 34

*Knox v. Brnovich*,
  907 F.3d 1167 (9th Cir. 2018) .......................................................... 48

*Landor v. La. Dep't of Corr. & Pub. Safety*,
  146 S. Ct. 1931 (2026) ..................................................................... 43

*Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*,
  469 U.S. 256 (1985) .................................................................... 30, 46

*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024) ......................................................................... 40

*Maine Forest Products Council v. Cormier*,
  51 F.4th 1 (1st Cir. 2022) ................................................................. 47

*Managed Pharmacy Care v. Sebelius*,
  716 F.3d 1235 (9th Cir. 2013) ..................................................... 62, 63

*Maryland v. King*,
  567 U.S. 1301 (2012) ....................................................................... 70

*Mayo v. United States*,
  319 U.S. 441 (1943) ......................................................................... 26

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ...................................................................... 19, 21

*McDaniel v. Wells Fargo Investments, LLC*,
  717 F.3d 668 (9th Cir. 2013) ............................................................ 47

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) ........................................................................ 42

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ........................................................ 15, 19, 30

*Monsanto Co. v. Durnell*,
146 S. Ct. 2001 (2026) ................................................................ 34

*Mont. Med. Ass'n v. Knudsen*,
119 F.4th 618 (9th Cir. 2024).............................................. 53, 54

*Montalvo v. Spirit Airlines*,
508 F.3d 464 (9th Cir. 2007)............................................... 37

*Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718 (9th Cir.
2016)............................................................................................. 37

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ......................................................... 16, 67, 68

*New York v. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020)....................................................... 72

*North Dakota v. United States*,
495 U.S. 423 (1990) ................................................. 21, 22, 23, 29

*Novartis Pharms. Corp. v. Hanaway*,
No. 25-1619, 2026 WL 1892141 (8th Cir. July 1, 2026)............................. 18

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) ...................................... 11, 38, 49, 51, 52, 57

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990) .................................................................. 30

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ................................................................. 48

*Peridot Tree WA, Inc. v. Wash. State Liquor & Cannabis Control Bd.*,
  162 F.4th 1179 (9th Cir. 2026) ................................................................... 67

*Pharm. Rsch. & Mfrs. of Am. v. Dep't Health & Human Servs.*,
  43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................... 39

*Pharm. Rsch. & Mfrs. of Am. v. Frey*,
  2026 WL 184504 (D. Me. Jan. 23, 2026) ......................................... 21, 22, 24

*Pharm. Rsch. & Mfrs. of Am. v. McClain*,
  95 F.4th 1136 (8th Cir. 2024) ............ 10, 18, 31, 35, 38, 40, 43, 49, 50, 51, 52

*Pharm. Rsch. & Mfrs. of Am. v. McCuskey*,
  171 F.4th 675 (4th Cir. 2026),
  *rehearing en banc granted* 176 F.4th 830 (4th Cir. 2026)
  ............................................................................... 20, 21, 24, 43, 54

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey*,
  760 F. Supp. 3d 439 (S.D.W. Va. 2024) ...................................................... 54

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
  153 F.4th 795 (9th Cir. 2025) .................................................................... 63

*Pharm. Rsch. & Mfrs. of Am. v. Torrez*,
  No. 1-25-cv-01225-MIS-JHR, 2026 WL 1752214 (D.N.M. May 26,
  2026) ........................................................................................................ 18

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
  538 U.S. 644 (2003) .................................................................. 31, 33, 41, 60

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*,
  361 U.S. 376 (1960) ................................................................................. 27

*Rekhter v. Dep't of Soc. & Health Servs.*,
  323 P.3d 1036 (Wash. 2014) ...................................................................... 70

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ................................................................................. 66

vii

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ....................................................................... 30

*Sanofi Aventis U.S. LLC v. Dep't Health & Hum. Servs.*,
  58 F.4th 696 (3d. Cir. 2023) ...................................... 5, 11, 38, 41, 51, 52, 65

*Sierra Med. Servs. All. v. Kent*,
  883 F.3d 1216 (9th Cir. 2018) ................................................... 62, 63

*Sperry v. Florida ex rel. Fla. Bar*,
  373 U.S. 379 (1963) ....................................................................... 46

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
  537 U.S. 51 (2002) ......................................................................... 37

*St. Luke's Health Sys., Ltd. v. Labrador*,
  782 F. Supp. 3d 953 (D. Idaho 2025) ............................................. 42

*Stanley v. City of Sanford*,
  606 U.S. 46 (2025) ......................................................................... 42

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002) ....................................................................... 61

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ............................................. 20, 28, 44

*United States v. King County*,
  122 F.4th 740 (9th Cir. 2024) ................................................. 25, 26

*United States v. Locke*,
  529 U.S. 89 (2000) ......................................................................... 32

*United States v. New Mexico*,
  455 U.S. 720 (1982) ....................................................................... 19

*United States v. Standard Oil Co. of Cal.*,
  332 U.S. 301 (1947) ....................................................................... 30

*United States v. Washington*,
  596 U.S. 832 (2022) .................................................................. 23, 25

*Va. Hosp. & Healthcare Ass'n v. Roberts*,
  671 F. Supp. 3d 633 (E.D. Va. 2023).................................................. 62, 64

*Valancourt Books, LLC v. Garland*,
  82 F.4th 1222 (D.C. Cir. 2023) ....................................................... 64

*Valle de Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013)......................................................... 47

*Ventress v. Japan Airlines*,
  747 F.3d 716 (9th Cir. 2014).......................................................... 38

*Vivid Ent., LLC v. Fielding*,
  774 F.3d 566 (9th Cir. 2014).......................................................... 17

*Washington v. United States*,
  460 U.S. 536 (1983) .................................................................. 28

*Whistler Invs., Inc. v. Depository Trust & Clearing Corp.*,
  539 F.3d 1159 (9th Cir. 2008)......................................................... 47

*Winter v. Nat. Res. Def. Council*, Inc.,
  555 U.S. 7 (2008) .................................................................... 17

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ....................................................... 31, 32, 36, 46, 61

*Zango, Inc. v. Kaspersky Lab, Inc.*,
  568 F.3d 1169 (9th Cir. 2009)......................................................... 65

## Constitutional Provisions

U.S. Const. amend. V................................................................... 61

U.S. Const. art. I, §8, cl. 3......................................................... 66

## Statutes

2026 Wash. Sess. Laws, ch. 227 (SB 5981) ...................... 13, 14, 32, 48, 55, 58

42 U.S.C. §1396r-8 ................................................................................... 4

42 U.S.C. §256b .................................................................... 4, 5, 6, 39, 55

Md. Code Ann., Health-Gen. §2-802 (West) ................................................ 69

Minn. Stat. §62J.842 ................................................................................ 69

Wash. Rev. Code §18.64.020 .............................................................. 7, 29

Wash. Rev. Code §18.64.046 .................................................................... 7

Wash. Rev. Code §69.41.030 .................................................................... 7

## Regulations

340B Drug Pricing Program; Administrative Dispute
   Resolution Regulation (ADR Rule), 89 Fed. Reg. 28643
   (Apr. 19, 2024) .......................................................... 7, 40, 56, 57

42 C.F.R. §10.21 ............................................................................ 50, 52

42 C.F.R. §10.3 ....................................................................................... 6

42 C.F.R. pt. 10 ..................................................................................... 52

Final Notice Regarding Section 602 of the Veterans Health
   Care Act of 1992 Entity Guidelines (1994 Guidance),
   59 Fed. Reg. 25110  (May 13, 1994) ......................................... 9, 59

Manufacturer Audit Guidelines and Dispute Resolution
   Process 0905-ZA-19, 61 Fed. Reg. 65406 (Dec. 12, 1996) ...................... 7, 56

Notice Regarding 340B Drug Pricing Program-Contract
   Pharmacy Services (2010 Guidance), 75 Fed. Reg. 10272 (Mar. 5,
   2010) ................................................................................. 8, 10

x

Notice Regarding Section 602 of the Veterans Health Care
Act of 1992; Contract Pharmacy Services (1996 Guidance),
61 Fed. Reg. 43549 (Aug. 23, 1996) ........................................ 8, 9, 10, 37, 57

Wash. Admin. Code §246-945-410 ............................................... 29

Other Authorities

Dep't of Health & Hum. Servs. Off. Gen. Couns., Advisory
Opinion 20-06 on Contract Pharmacies Under the 340B
Program (Dec. 30, 2020) ................................................................ 11

H.R. Rep. No. 102-384, pt. II (1992) .............................................. 4, 5

Health Res. & Serv. Admin., *340B Drug Pricing Program,
Program Integrity* ......................................................................... 11

## I.    INTRODUCTION

When Congress created the 340B program, its intent was "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." To achieve that objective, the 340B program requires pharmaceutical companies to sell certain drugs at a discount to certain safety-net providers (i.e., "covered entities") as a condition of the pharmaceutical companies' participation in Medicaid and Medicare Part B. Covered entities, in turn, use these savings to fund critical healthcare services that would otherwise operate at a loss, provide prescription drug discounts to low-income patients, and more.

The federal 340B statute (Section 340B of the Public Health Service Act) controls the price that covered entities pay for discounted 340B drugs. However, as four federal circuit courts have confirmed, Section 340B is silent about how the medications are distributed to patients. For decades, it was broadly understood that 340B drugs could be delivered to covered entities' patients via outside pharmacies ("contract pharmacies"). Contract pharmacies are an essential component of the 340B program, as the vast majority of covered entities do not have their own in-house pharmacies, and patients in rural areas may be over a hundred miles away from the covered entity where they receive

care. But in the last six years, drug manufacturers have sought to exploit the statute's silence on drug distribution by drastically limiting the use of contract pharmacies and conditioning distribution on covered entities' submission of burdensome claims data. These restrictive policies have significantly reduced covered entities' revenue and directly jeopardized their ability to serve patients.

To ensure that safety-net providers remain financially viable and able to provide essential health services, Washington and at least twenty other states took action against these harmful policies. At issue here is Washington's law, which prohibits drug manufacturers from restricting covered entities' distribution of 340B drugs via contract pharmacies and from conditioning the delivery of 340B drugs on a covered entity's submission of claims data. Many analogous state laws are already in effect across the country, and the vast majority have been upheld by courts.

Consistent with those decisions, the district court below properly exercised its discretion when it declined to preliminary enjoin Washington's law. Appellants are not likely to prevail on the merits of any of their claims. AbbVie and PhRMA's intergovernmental immunity claims fail because that doctrine relates to whether a state can directly regulate or discriminate against the *federal government* and its contractors, not private drug manufacturers. Appellants'

preemption claims fail because Section 340B simply does not address 340B drug distribution, so the field is not preempted and there is no obstacle to federal law. AbbVie's Takings Clause claim fails because manufacturers voluntarily participate in the 340B program, and Washington's law does not physically "take" anything from anyone. Novartis's Dormant Commerce Clause claim fails because Washington's law has, at most, an indirect effect on interstate commerce of exactly the kind the Supreme Court has held is well within states' constitutional authority.

Appellants have also failed to show they will suffer irreparable harm in the absence of an injunction. Moreover, the balance of the equities and public interest weigh against injunctive relief. The district court should be affirmed.

## II.    STATEMENT OF THE ISSUE

A newly enacted Washington law prohibits drug manufacturers participating in a voluntary federal program from imposing restrictive policies related to contract pharmacies and claims data submissions—topics that the statute governing the federal program does not address. Did the district court properly deny preliminary injunctive relief after concluding that the manufacturers were unlikely to succeed on the merits of their claims and failed to show irreparable injury?

### III.  STATEMENT OF THE CASE

**A.  The Federal 340B Program: A Safety Net for Safety-Net Providers**

In 1992, Congress enacted Section 340B of the Public Health Service Act (the 340B program) to enable safety-net healthcare providers "to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." *See* H.R. Rep. No. 102-384, pt. II, at 12 (1992). The 340B program requires drug manufacturers that participate in Medicaid and Medicare Part B to agree to offer certain drugs to certain "covered entities" at a discount. *See* 42 U.S.C. §§256b(a)(1), (4). Covered entities include certain hospitals, community health centers, and clinics that serve low-income patients and other marginalized populations. *Id.* The type of drugs sold and the maximum price for a 340B drug are set out in the statute. *Id.* §§256b(a)(1), (3), 1396r-8(a)(1), (5). The 340B program helps covered entities serve vulnerable patients because the entities earn savings when insurance companies reimburse them at full price for drugs that they bought at the 340B discount. *E.g.*, 2-NovER-162, 318.

The 340B program has become a critical lifeline to these covered entities, which have razor thin operating margins that are getting thinner. *See* 2-NovER-164, 324-28, 332-33; 3-NovER-391, 421. As just one example, Coulee

Medical Center, a safety-net hospital located in rural Eastern Washington, had an operating margin of negative 2.3% in 2024, representing a loss of about one million dollars. 3-NovER-343. This is consistent with Washington hospitals generally, which collectively suffered operating losses of $1.74 billion in 2023. 2-NovER-164. Covered entities use the savings from the 340B program to provide prescription drug discounts for low-income patients, fund critical healthcare programs that operate at a loss, and more. *E.g.*, 2-NovER-318-33; 3-NovER-391-92.

"Section 340B's substantive requirements and restrictions are few." *Sanofi Aventis U.S. LLC v. Dep't Health & Hum. Servs.*, 58 F.4th 696, 700 (3d. Cir. 2023). Section 340B does not limit how many discounted drugs a covered entity may purchase. *See* H.R. Rep. No. 102-384, pt. II, at 16. Nor does it tell covered entities how to spend the savings they generate. *Id.* at 12. In this way, the 340B program is not a patient-discount program but a provider-support mechanism. Within Section 340B, Congress only imposed two broad limits on covered entities. First, to prevent duplicate discounts, covered entities may not request a 340B discount for a drug that is already subject to a Medicaid rebate. 42 U.S.C. §256b(a)(5)(A). Second, covered entities may not engage in diversion by reselling or transferring the drugs to someone who is not a qualifying patient.

*Id.* §256b(a)(5)(B).

Drug manufacturers' participation in the 340B program is voluntary. Manufacturers must affirmatively opt into the program by signing Pharmaceutical Pricing Agreements (PPAs) with the Department of Health and Human Services (HHS). *Id.* §256b(a)(1); 42 C.F.R. §10.3. PPAs are form agreements that merely recite the statutory obligations. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011).

The Health Resources and Services Administration (HRSA), an agency within HHS, administers the 340B program. HRSA's rulemaking authority is limited to (1) establishment of an administrative dispute resolution (ADR) process; (2) drug-pricing methodology; and (3) imposition of monetary sanctions for violations. *See* 42 U.S.C. §256b(d)(1)(B)(i), (1)(B)(vi), (3). HRSA's ADR process is circumscribed: covered entities can bring claims regarding overcharges, and manufacturers can bring claims regarding duplicate discounts and diversion. *Id.* §256b(d)(3)(A). In appropriate cases, HHS may impose a variety of sanctions for these violations. *Id.* §§256b(a)(5)(D), 256b(d).

Both HRSA and drug manufacturers can audit covered entities to ensure compliance with the diversion and duplicate discount provisions. *Id.* §256b(a)(5)(C). To conduct an audit, HRSA or a drug manufacturer must have

6

"reasonable cause" that a covered entity may have violated the statute. *See* Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 Fed. Reg. 65406, 65409 (Dec. 12, 1996). This "reasonable cause" standard, however, is "not overly burdensome" and does not "present any barriers to a manufacturer's ability to perform an audit of a covered entity." *See* 340B Drug Pricing Program; Administrative Dispute Resolution Regulation (ADR Rule), 89 Fed. Reg. 28643, 28646 (Apr. 19, 2024).

**B.    Contract Pharmacies Are Necessary for 340B Drug Distribution**

Section 340B addresses the sellers (drug manufacturers) and the buyers (covered entities) of the program. But it has always been silent on the delivery of drugs from buyer to patient. This makes sense because the ways in which patients receive prescription drugs is predominantly governed by state law. Washington generally requires drugs to be prescribed by one licensed professional (e.g., a doctor), and distributed to patients by another (e.g., a pharmacist). *E.g.*, Wash. Rev. Code §§69.41.030, 18.64.020, 18.64.046.

When Congress enacted Section 340B in 1992, only a "very small number" of the initial 11,500 covered entities had in-house pharmacies that they could use to dispense drugs to patients. Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg.

7

43549, 43550 (Aug. 23, 1996) (1996 Guidance). Thus, most covered entities entered into contracts with external pharmacies to dispense 340B drugs. These "contract pharmacies" encompass a range of pharmacies including retail, local, and specialty pharmacies. Covered entities purchase and pay for the 340B drugs from manufacturers, and manufacturers ship them to the contract pharmacies for distribution to eligible patients. Thus, the contract pharmacy is a distribution intermediary for the covered entity but is not a buyer itself. 2-NovER-165.

Covered entities cannot dispense all their 340B drugs at in-house pharmacies. For starters, not all covered entities have in-house pharmacies. *E.g.*, 1996 Guidance, at 43550. Patients also have the freedom to choose where to pick up their prescriptions, and covered entities may not restrict this choice. *See* Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services (2010 Guidance), 75 Fed. Reg. 10272, 10278 (Mar. 5, 2010); *see also* 2-NovER-168-69, 322; 3-NovER-429-30 (patients are unable to use only in-house pharmacies). And covered entities with sprawling service areas, such as rural hospitals, rely on contract pharmacies to dispense medication near where patients live. 2-NovER-334, 3-NovER-407.

HRSA lacks rulemaking authority over contract pharmacies' distribution of 340B drugs. However, HRSA has, on several occasions, issued guidance on

the use of contract pharmacies. First, in 1994—just two years after Congress enacted Section 340B—HRSA described covered entities' use of "contract pharmacies" as a "customary business practice" and warned that any manufacturer limitations on these transactions could "discourag[e] entities from participating in the program." Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines (1994 Guidance), 59 Fed. Reg. 25110, 25113 (May 13, 1994).

In 1996, HRSA issued guidance confirming contract pharmacies' place within the 340B landscape:

> The statute *is silent as to permissible drug distribution systems*. There is *no requirement* for a covered entity to purchase drugs directly from the manufacturer or *to dispense drugs itself*. It is clear that *Congress envisioned that various types of drug delivery systems would be used* to meet the needs of the very diversified group of 340B covered entities.

1996 Guidance, at 43549 (emphasis added). The 1996 Guidance stated that it is "the Department's position that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price." *Id.* HRSA also explained that the use of contract pharmacies is not in tension with the statutory prohibition on diversion. Instead, contract pharmacies provide covered entities that otherwise would be unable to participate "a process for

9

accessing 340B pricing" but "does not in any way extend this pricing to entities which do not meet program eligibility." *Id.* Under the 1996 Guidance, HRSA allowed covered entities to each use one contract pharmacy. *Id.*

In 2010, HRSA issued new guidance expanding the use of contract pharmacies further, allowing covered entities to use an unlimited number. *See* 2010 Guidance, at 10272-73. HRSA endorsed an expanded use of contract pharmacies because covered entities could "more effectively utilize the 340B program and create wider patient access." *Id.* This guidance applied to covered entities regardless of whether they had in-house pharmacies. *Id.*

Starting in 2020, some manufacturers began to limit covered entities' use of contract pharmacies. 2-NovER-174. Restrictions included limiting the number of pharmacies to which they would deliver drugs, imposing a maximum allowable distance between the covered entity and the pharmacy, and requiring covered entities to submit claims data. 2-NovER-170, 174-77. "This caused covered entities dependent on contract pharmacies to become unable to serve patients in need." *Pharm. Rsch. & Mfrs. of Am. v. McClain*, 95 F.4th 1136, 1139 (8th Cir. 2024).

HRSA stepped in. First, it released an Advisory Opinion "declaring that Section 340B unambiguously requires drug makers to deliver 340B drugs to an

10

unlimited number of contract pharmacies." *Sanofi Aventis*, 58 F.4th at 701 (citing Dep't of Health & Hum. Servs. Off. Gen. Couns., Advisory Opinion 20-06 on Contract Pharmacies Under the 340B Program (Dec. 30, 2020)). Second, it issued violation letters to several drug manufacturers in 2021, finding their policies that restricted covered entities' ability to use contract pharmacies and required claims data to be unlawful.[1]

Certain drug manufacturers, including Appellant Novartis, brought lawsuits challenging these actions by HHS. The Third Circuit and D.C. Circuit both found HHS's efforts to require manufacturers to allow delivery of 340B drugs to an unlimited number of contract pharmacies were unlawful. *See Sanofi Aventis*, 58 F.4th at 706; *see also Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 464 (D.C. Cir. 2024). The courts reasoned that because Section 340B is silent regarding delivery to contract pharmacies, HRSA erred in concluding the statute required delivery of discounted drugs to unlimited contract pharmacies. *See Sanofi Aventis*, 58 F.4th at 703; *see also Johnson*, 102 F.4th at 461.

---

[1] Health Res. & Serv. Admin., *340B Drug Pricing Program, Program Integrity*, available at https://www.hrsa.gov/opa/program-integrity.

## C.     Drug Manufacturers' Current Restrictions

After the rulings from the Third and D.C. Circuits, manufacturer-imposed restrictions have proliferated. Currently, at least forty drug manufacturers, including Appellants, limit the use of contract pharmacies by covered entities in Washington and/or require submission of transactional-level claims data. 1-NovER-15-16; 2-NovER-175; 3-NovER-399, 432. Due to these restrictions, covered entities in Washington have lost a substantial portion of 340B savings. *E.g.*, 2-NovER-322 ($7 million from 10 FQHCs); 2-NovER-334; 3-NovER-393, 399, 412 (quantifying losses). For example, one hospital with a broad, rural service area and no in-house pharmacy has seen its 340B savings slashed by approximately two thirds. 2-NovER-334.

Manufacturers' claims data requirements are burdensome. 3-NovER-431-32. They each have different requirements that necessitate processing very large amounts of data, which often exceeds the capacity of covered entities' employees. 2-NovER-326-27; 3-NovER-431-32. While manufacturers assert that the purpose of this data collection is to avoid duplicate discounts, the manufacturers' terms establish that the claims data may be used broadly and that much of the data can be used effectively in perpetuity. 2-NovER-327. Drug manufacturers have significant financial incentives to obtain

12

covered entities' claims data that are unrelated to covered entities' Section 340B compliance, such as manufacturers seeking to deny commercial rebate requests from pharmacy benefit managers. 2-NovER-170-72.

## D. Washington Responds to Restrictive Manufacturer Policies

In response to the harm caused by manufacturers' restrictions, Washington and over twenty other states have attempted to fill the "silence" in Section 340B by passing laws that prohibit drug companies from limiting the number of contract pharmacies that covered entities can use to deliver 340B drugs. Many of these statutes, including Washington's, also prohibit drug companies from conditioning the delivery of 340B drugs on covered entities providing far-reaching claims-data. 2026 Wash. Sess. Laws, ch. 227 (SB 5981).

On March 25, 2026, Washington enacted SB 5981, which went into effect on June 11, 2026. SB 5981 contains two provisions at issue on this appeal:

- **Delivery restriction:** A manufacturer may not "deny, restrict, or prohibit the acquisition … or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law prohibits receipt of the 340B drug." SB 5981 §3(1).

13

- **Claims data restriction:** A manufacturer may not "require a covered entity to submit any claims, utilization, purchasing, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity," contract pharmacy, or other authorized location "unless federal law requires such data sharing." *Id.* §3(2).[2]

SB 5981 allows a covered entity to file a civil action and the Attorney General's Office to bring an action for violations. *See id.* §4.

SB 5981's legislative findings confirm that its purpose is complementary to Section 340B's. For example, SB 5981 states that Section 340B is "essential" for "health care access to low-income and uninsured populations"; Congress sought to enable covered entities to "stretch scarce federal resources as far as possible"; HRSA permits the use of contract pharmacies which "enable[s] access to life-saving drugs"; and "contract pharmacies are crucial to Washington's safety net providers by ensuring patients can access their prescribed medications, while providing additional resources" to covered entities "to serve vulnerable and underserved populations." *Id.* §§1(1)-(4).

---

[2] SB 5981 includes additional provisions, such as reporting requirements for manufacturers and certain covered entities, that are not relevant to this appeal.

On June 9, 2026, the district court denied Appellants' motions to preliminary enjoin SB 5981. 1-NovER-64.

## IV. SUMMARY OF ARGUMENT

**SB 5981 does not violate the Supremacy Clause.** The intergovernmental immunity doctrine, which concerns whether states may directly regulate or discriminate against the *federal government* and its contractors, does not apply for multiple independent reasons. Private drug manufacturers are not working on behalf of the federal government when they sell 340B drugs to covered entities. So, they are not "contractors" or "those with whom the government deals" in any constitutionally protected sense. Moreover, SB 5981 does not increase costs to the federal government, nor is it discriminatory when viewed within the larger context of pharmacy and drug distribution regulations.

SB 5981 is also not preempted. While the presumption against preemption applies "in all preemption cases," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), it applies "with special force" when states regulate public health and safety, like here. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). And regardless of whether this presumption applies, this is not one of the rare cases where Congress preempted the field, no matter how that field is defined. Where federal law is silent, courts will not find preemption. Additionally, Appellants'

15

obstacle preemption theories merely request "a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," which is insufficient. *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (citation modified).

**SB 5981 does not violate the Takings Clause.** There is no taking because participation in the 340B program is voluntary, and drug manufacturers can avoid application of the law. Moreover, AbbVie, the sole Appellant pressing this claim, only brings a *physical* takings argument. But SB 5981 does not physically take AbbVie's property. AbbVie says that Washington's law forces it to sell an unlimited number of drugs to covered entities at a discounted price, but it is the federal law—not Washington's—that governs such topics. And even if AbbVie could overcome those hurdles, and it cannot, SB 5981 clearly serves a public purpose, so AbbVie would not be entitled to an injunction anyway.

**SB 5981 does not violate the Dormant Commerce Clause.** SB 5981 regulates solely intrastate transactions: the terms of delivery of 340B drugs to covered entities in Washington. It does not discriminate against interstate commerce or say anything about the sales of drugs between manufacturers and their distributors. The Supreme Court has closed the door on this kind of claim. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023).

Finally, Appellants cannot meet their burden on the remaining factors necessary for preliminary injunctive relief. The district court found they did not prove irreparable injury. 1-NovER-62-63. The court also found that "[c]overed entities in Washington provide a range of services to a broad spectrum of under-resourced communities and invest 340B savings in a variety of ways based on the needs of those communities." 1-NovER-5 (quoting record, internal punctuation omitted). Because it did not abuse its discretion in denying preliminary injunctive relief, the district court's order should be affirmed.

## V.    STANDARD OF REVIEW

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, Inc., 555 U.S. 7, 22-24 (2008). Denial of a preliminary injunction is reviewed for abuse of discretion. *See Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014). Under this standard, "as long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citation modified). The district court only abuses its discretion when its decision is based on "an erroneous legal standard or on clearly erroneous findings of fact."

*Id.* "This review is limited and deferential, and it does not extend to the underlying merits of the case." *Id.*

## VI. ARGUMENT

### A. SB 5981 Does Not Violate the Supremacy Clause

Under a straightforward application of binding precedent, SB 5981 is constitutional. Aside from a vacated Fourth Circuit decision, Circuit Courts of Appeals have consistently reached that same conclusion when upholding similar state laws. *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 648 (5th Cir. 2025); *AbbVie, Inc. v. Murrill*, Nos. 24-30645, 24-30651, 24-30673, 2026 WL 1947948, at *8 (5th Cir. July 6, 2026); *McClain*, 95 F.4th at 1146; *Novartis Pharms. Corp. v. Hanaway*, No. 25-1619, 2026 WL 1892141, at *11-12 (8th Cir. July 1, 2026). So too have most district courts. *See* 2-AbbVieER-186-87 (collecting cases); *see also PhRMA v. Torrez*, No. 1-25-cv-01225-MIS-JHR, 2026 WL 1752214, at *1 (D.N.M. May 26, 2026); *Astrazeneca Pharms. LP v. Frey*, No. 1:25-cv-00495-JCN, 2026 WL 2145194, at *1 (D. Me. July 27, 2026). This Court should likewise conclude that SB 5981 does not violate the Supremacy Clause.

The Supremacy Clause is part of the larger compromise between the federal government and the states. *See Armstrong v. Exceptional Child Care Ctr., Inc.*, 575 U.S. 320, 325 (2015) ("[I]t is important to read the Supremacy

18

Clause in the context of the Constitution as a whole."). Federal law is supreme, but federal power is limited. *See Bond v. United States*, 572 U.S. 844, 854 (2014) ("In our federal system, the national Government possesses only limited powers"); *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819) ("the powers of the government are limited"). State law is subordinate, but state power is general. *See Bond*, 572 U.S. at 854 ("The States have broad authority to enact legislation for the public good—what we have often called a police power.") (citation modified); *see also Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985) ("within the realm of authority left open to them under the Constitution, the states must be equally free to engage in any activity that their citizens choose for the common weal").

Accordingly, the reach of the Supremacy Clause is confined to carefully circumscribed doctrines. Intergovernmental immunity prevents states from directly interfering in the operation of the federal government, but that doctrine is significantly limited when applied to private actors. *See United States v. New Mexico*, 455 U.S. 720, 737 (1982) (explaining that the immunity of federal contractors has "narrow constitutional limits"). And the preemptive effect of federal legislation is also interpreted through this lens. *See Medtronic, Inc.*, 518 U.S. at 485 ("Congress does not cavalierly pre-empt [state law].").

19

This Court has also made clear that the doctrines of intergovernmental immunity and preemption are "distinct" and apply in different circumstances. *United States v. California*, 921 F.3d 865, 884 n.9 (9th Cir. 2019); *see also GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) ("Modern Supremacy Clause cases" distinguish between these "two separate doctrines"). Ignoring that precedent, AbbVie and PhRMA improperly blur together these different doctrines to attempt to manufacture a Supremacy Clause violation. *E.g.*, Dkt. #16.1 at 37-40 (mixing intergovernmental immunity doctrine with argument that Spending Clause legislation is entitled to greater preemptive effect); Dkt. #18.1 at 38-39 (blurring "intergovernmental immunity, obstacle preemption, [and] field preemption" together). The only support Appellants have for their approach comes from the now-vacated Fourth Circuit decision in *PhRMA v. McCuskey*, where the court mixed intergovernmental immunity, preemption analysis, and Spending Clause principles to strike down a law similar to SB 5981. *See* 171 F.4th 675, 688-91 (4th Cir. 2026), *rehearing en banc granted* 176 F.4th 830 (4th Cir. 2026). But that decision was vacated, has no precedential or persuasive value, and is simply wrong. This Court should adhere to its precedent, evaluate these doctrines separately, and conclude that SB 5981 is neither barred by intergovernmental immunity nor preempted.

20

### 1. SB 5981 is not barred by intergovernmental immunity

Every federal court to have considered the issue has held that state laws like SB 5981 are consistent with the intergovernmental immunity doctrine. *E.g.*, *AbbVie, Inc. v. Weiser*, 811 F. Supp. 3d 1264, 1275-76 (D. Colo. 2025); *AstraZeneca Pharms. LP v. Lopez*, No. 25-00369, 2026 WL 497141, at \*16 (D. Haw. Feb. 23, 2026); *Pharm. Rsch. & Mfrs. of Am. v. Frey*, 2026 WL 184504, at \*6-7 (D. Me. Jan. 23, 2026). Even the vacated opinion that AbbVie and the United States as amicus rely on for their intergovernmental immunity argument explicitly held that "the intergovernmental-immunity doctrine does not control here." *McCuskey*, 171 F.4th at 689.

Under the intergovernmental immunity doctrine, the federal government is immune from regulation by the states. "[I]t is essential to the existence and preservation of the government, that congress should be able to exercise its constitutional powers, at its own discretion, without being subject to the control of state legislation." *McCulloch*, 17 U.S. at 330. But that does not mean "that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality op.). Instead, the Supreme Court has "adopted a functional approach to claims of governmental immunity, accommodating of the full range of each

21

sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *Id.* at 435.

Under this approach, a state law is invalid under the intergovernmental immunity doctrine "*only if*" it: (1) "regulates the United States directly" or (2) "discriminates against the Federal Government or those with whom it deals" such that the federal government is disadvantaged "with regard to the economic burdens that result." *Id.* (emphasis added). SB 5981 is constitutional under this test.

### a.  SB 5981 does not directly regulate the federal government

SB 5981 does not directly regulate the federal government, as the law applies to private drug manufacturers; it does not regulate the United States, its agencies, or its employees. *See Lopez*, 2026 WL 497141, at *15 (finding that a similar state law does not directly regulate the United States); *see also Frey*, 2026 WL 184504, at *6 (same). Only PhRMA even attempts to assert SB 5981 engages in direct regulation, but PhRMA merely cites the inapplicable cases described below. Dkt #16.1 at 36; *infra* §VI.A.1.b.

### b. SB 5981 does not discriminate against the federal government or those with whom it deals

AbbVie and PhRMA argue that they are discriminated against as manufacturers participating in the 340B program. Dkt. #16.1 at 42-43; Dkt. #18.1 at 37. This argument fails for three independent reasons.

In order to establish discriminatory regulation, Appellants must show that: (1) 340B drug manufacturers deal with the federal government in a constitutionally meaningful sense (e.g., as contractors or suppliers); (2) 340B drug manufacturers were acting on behalf of the federal government when they imposed the restrictive conditions at issue in SB 5981; *and* (3) the federal government has been disadvantaged with regard to the economic burdens that result from the supposed discrimination in SB 5981. *See United States v. Washington*, 596 U.S. 832, 833-39 (2022) (holding that a law violates the doctrine when it "discriminate[s] against the Federal Government or its contractors" working on behalf of United States and "imposes upon the Federal Government costs that state or private entities do not bear."); *see also North Dakota*, 495 U.S. at 429-39 (holding that a state law discriminates if it relates to an entity's status as "a Government contractor or supplier" and discriminates "with regard to the economic burdens that result" against the federal government). However, AbbVie and PhRMA cannot establish *any* of these

23

requirements. They do not show "a likelihood of success on—*or even serious questions going to*—the merits of this argument." *Lopez*, 2026 WL 497141, at *15 (emphasis added).

**First**, drug manufacturers that impose conditions on their offers of 340B drugs to covered entities are not federal contractors or suppliers nor are they "dealing" with the federal government. *See McCuskey*, 171 F.4th at 689 (quoting *Astra*, 563 U.S. at 113) ("A manufacturer that participates in the 340B program is not strictly a federal contractor or supplier, as the Pharmaceutical Pricing Agreements between HHS and manufacturers 'are not transactional, bargained-for contracts' … [n]or do the manufacturers supply drugs to the federal government"). Instead, 340B drug manufacturers provide "discounts in the marketplace to certain other private entities[.]" *Frey*, 2026 WL 184504, at *6. The transaction that SB 5981 regulates—the terms of distribution to patients connected to a sale between drug manufacturers and covered entities—does not have the federal government at either end of it. The district court correctly concluded, therefore, that "participation in a voluntary regulatory program" does not confer "federal contractor status." 1-NovER-23.

**Second**, drug manufacturers are not working on *behalf of* the federal government such that they are entitled to constitutional protections. No provision

24

of Section 340B directs manufacturers to restrict covered entities' use of contract pharmacies or require the provision of claims data. Nor is there any federal objective that is served by these conditions that the Appellants seek to impose on 340B drug delivery. They argue only that federal law implicitly allows them to impose those conditions to serve their *own* interests.

Therefore, this is not like cases applying the intergovernmental immunity doctrine to federal contractors who furthered federal government operations under the control of, and at the direction of, the federal government. For example, in *Washington*, Washington State enacted a workers' compensation law "that, by its terms, applied only to Hanford site workers engaged in the performance of work, either directly or indirectly, for the United States." 596 U.S. at 836 (citation modified). The law violated the prohibition in the Supremacy Clause against states "interfering with or controlling the operations of the Federal Government." *Id.* at 838-39. The same principle struck down a King County executive order that "regulate[d] the way in which the federal government transports noncitizen detainees by preventing ICE from using private [air transportation] contractors at Boeing Field." *United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024). There, the executive order regulated

25

"who will carry out federal functions" and "[ran] afoul of the Supremacy Clause." *Id.*

But here, Appellants are not performing any function for the United States. In the transactions regulated by SB 5981, the United States is not selling drugs, purchasing drugs, or distributing drugs and there is no conceivable way that SB 5981 interferes with "the federal government's independence from state control." *Id.* at 756; *see also Lopez*, 2026 WL 497141, at *15 ("when states regulate manufacturers' efforts to do what federal law does not instruct them to do, the state laws are not regulating any act compelled or directed by the federal government, but instead the private conduct (and choices) of the manufacturers themselves").

For that reason, none of the cases AbbVie and PhRMA cite for support supply it. *See GEO Grp., Inc.*, 50 F.4th at 761 (intergovernmental immunity barred law that would prevent Immigrations and Custom Enforcement from contracting with private detention facilities); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839-43 (9th Cir. 2014) (intergovernmental immunity barred state law setting standards for environmental cleanup at federal site performed by federal contractor); *Mayo v. United States*, 319 U.S. 441, 447 (1943) (holding state fee for the inspection of fertilizer could not be charged against the United

26

States); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325 (3rd Cir. 2025) (striking down state law prohibiting private detention centers for immigration enforcement purposes because it "prevent[ed] the federal government from choosing how and through whom it [would] carry out a core federal function"); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507-08 (1988) (holding state tort law was displaced by federal procurement contract that conflicted with it).[3]

**Third**, SB 5981 also does not discriminate against the federal government by imposing increased costs. Indeed, it does not impose costs on the federal government *at all*. The federal government does not pay for the 340B drugs that covered entities purchase, so it is no additional burden on the federal government even if, as Appellants assert, SB 5981 results in more 340B drugs being sold. *E.g.*, *Lopez*, 2026 WL 497141 at *16 (explaining that it is not the federal government who bears the costs of a law similar to SB 5981, but rather the "manufacturers themselves"). For this reason, the Court does not need to consider whether SB 5981 sits within a generally applicable regulatory scheme. "[B]ecause the question of general applicability is not implicated if the federal

---

[3] Additionally, PhRMA's citation to *Phillips Chemical* is inapposite; there the state sought to functionally tax federally owned land by imposing a tax on its lessees instead. *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 384-85 (1960).

government does not bear the financial burden of the state law in the first place," it does not matter that SB 5981 applies only to drug manufacturers that participate in the 340B program. *Id.* For example, an *explicitly* discriminatory tax on federal contractors was upheld where the tax was *less* for federal contractors than for everyone else, resulting in no net economic burden on the federal government. *Washington v. United States*, 460 U.S. 536, 544 (1983). "The important consideration … is not whether the State differentiates in determining what entity shall bear the legal incidence of the tax, but whether the tax is discriminatory with regard to the economic burdens that result." *Id.*[4] Similarly, this Court has explained that when the federal government is merely "targeted" by a state law, that does not "implicate intergovernmental immunity," because the federal government must have been "burdened" such that it is being treated "worse" than others. *California*, 921 F.3d at 880-81. Here, the federal government bears no economic burden, so there is no violation of intergovernmental immunity.

---

[4] Thus, PhRMA's baseless claim that SB 5981 "target[s] the 340B Program" and that "alone" is "reason enough to conclude that S.B. 5981 violates the Supremacy Clause" is directly contradicted by Supreme Court precedent. Dkt #16.1 at 42-43.

28

Although PhRMA briefly speculates that SB 5981 imposes federal costs by amplifying the need for agency oversight, PhRMA fails to recognize that any agency audits concerning diversion or duplicate discounts are pursuant to the *federal* statute, not imposed by SB 5981. Nor would any increased audit costs (even if shown to exist) be a result of any purported discrimination in SB 5981.

Regardless, SB 5981 does not discriminate against manufacturers who participate in the 340B program in light of "the entire regulatory system." *See North Dakota*, 495 U.S. at 435. Drug manufacturers generally do not impose the sorts of conditions on market-rate purchasers as they impose on covered entities—there is no reason to. *See* 1-NovER-33-34.[5] Generally speaking, Washington requires patients to get their drugs from pharmacies, not hospitals or health clinics. *See* Wash. Rev. Code §18.64.020. And pharmacies have an obligation to maintain an adequate supply of drugs and fill prescriptions from the public within a reasonable time. Wash. Admin. Code §§246-945-410(4), 415(2). SB 5981 merely requires for the 340B program what prevails for

---

[5] PhRMA's claim that the district court's conclusion is reversible because Washington did not argue it is incorrect. *See* 2-AbbVieER-207 (arguing that "SB 5981 also does not impose costs on the federal government in a discriminatory way."). Regardless, on preliminary injunction "as long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result." *Seabrook*, 677 F.3d at 864 (citation modified).

29

market-rate drugs—that patients get their prescriptions from their health care provider of choice and fill those prescriptions at their pharmacy of choice.

Given that PhRMA's intergovernmental immunity claim fails for multiple reasons, PhRMA seeks to invent an entirely novel and unsupported basis for intergovernmental immunity: that 340B is a "federal-spending power program." Dkt. #16.1 at 37. Yet, when asserting this unrecognized theory, PhRMA merely cites cases that never mention intergovernmental immunity at all. *E.g.*, *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256 (1985); *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301 (1947); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990); *Rust v. Sullivan*, 500 U.S. 173 (1991). Not only is PhRMA's argument wholly unsupported, but it also contradicts binding Supreme Court precedent narrowly limiting the applicability of the intergovernmental immunity doctrine, as described above.[6]

### 2. SB 5981 is not preempted

#### a. The presumption against preemption applies

The presumption against preemption applies in "all pre-emption cases." *Medtronic, Inc.*, 518 U.S. at 485. And it has "particular force" when Congress

---

[6] The intergovernmental immunity arguments in the United States' amicus brief—which merely repeat AbbVie and PhRMA's arguments—fail for the same reasons. Dkt. #26.1; *see also infra* §VI.A.2.c.v.

30

"legislated in a field traditionally occupied by the States," such as public health and drug regulation. *Altria*, 555 U.S. at 77; *Fitch*, 152 F.4th at 648; *Wyeth v. Levine*, 555 U.S. 555, 565 n.3, 578 (2009). Additionally, the presumption against preemption of a state statute designed to foster public health has "special force when it appears that the two governments are pursuing common purposes." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 666 (2003) (citation modified).[7]

Multiple federal courts have found this presumption applies when analyzing similar state laws. *E.g.*, *Murrill*, 2026 WL 1947948, at *5; *Fitch*, 152 F.4th at 648; *McClain*, 95 F.4th at 1140, 1144. The district court correctly reached the same conclusion here. 1-NovER-27-29. SB 5981 seeks to "foster public health and is pursuing a common purpose alongside the 340B program." 1-NovER-29. The "goals of SB 5981" are "in harmony with the federal goals" of promoting the financial savings of covered entities so they can stretch scarce healthcare dollars and support underserved communities. 1-NovER-40; *see also*

---

[7] Novartis and PhRMA incorrectly argue that *Walsh* does not apply because it concerned a cooperative program (i.e., Medicaid). Dkt. #21.1 at 43; Dkt. #16.1 at 52. But *Walsh* did not cabin its holding in this respect, instead holding generally with respect to any "state statute designed to foster public health." 538 U.S. at 646. Nor have other courts limited *Walsh* in this arbitrary way. *E.g.*, *Pharm. Care Mgmt. Ass'n v. Rowe*, 307 F. Supp. 2d 164, 171-72 (D. Me. 2004).

31

SB 5981 §§1(2), 1(9) (echoing the federal purpose to "reach[] more eligible patients and provid[e] more comprehensive services").

The district court properly held that the presumption against preemption applies, rejecting Appellants' argument to the contrary, and this Court should do the same. First, Novartis and PhRMA argue there is no presumption against preemption because the 340B program has a "history of significant federal presence." Dkt. #21.1 at 39-40; Dkt. #16.1 at 53. However, the Supreme Court has held that the existence of a federal program or history of federal regulation is not dispositive. *E.g.*, *Wyeth*, 555 U.S. at 564 n.3 (presumption against preemption applies even if "the Federal Government has regulated [in that field] for more than a century"). Cases cited by Appellants having to do with uniquely federal interests do not apply to legislation about health care access. *See United States v. Locke*, 529 U.S. 89, 99, 108 (2000) (finding a "history of significant federal presence" for "national and international maritime commerce," which is "an area where the federal interest has been manifest since the beginning of our Republic"); *see also Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1105 (10th Cir. 2015) (benefits for federal employees).

Second, Novartis and AbbVie argue that the presumption does not apply because SB 5981 would interfere with "inherently federal" relationships.

32

Dkt. #21.1 at 40-42; Dkt. #18.1 at 40-42. However, the mere agreement to participate in a federal drug discount program is insufficient to negate the presumption against preemption. *E.g.*, *Walsh*, 538 U.S. at 666-68. The two cases cited by Appellants are distinguishable for the reasons explained by the district court. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001); *Geo Grp.*, 50 F.4th at 761. In *Buckman*, the plaintiff sought to prosecute fraud against a federal agency rather than enforce a separate state obligation, and "fraud against federal agencies" is not a field which states have traditionally, or ever, occupied. 1-NovER-24-25. And in *GEO Group*, the state law at issue regulated federal contractors acting on behalf of federal immigration officials; here, "drug manufacturers are not contractors" acting at the direction of the federal government, nor does SB 5981 regulate an area of "'significant federal presence' such as immigration." *Id.*

Finally, Novartis and AbbVie challenge the district court's determination that SB 5981 relates to "public health," "the practice of pharmacy," and "drug regulation," all of which are "traditionally left to state regulation." 1-NovER-36. As an initial matter, AbbVie fixates on whether SB 5981 specifically relates to drug *delivery*, ignoring that SB 5981 relates to public health and drug regulation more generally. Dkt. #18.1 at 42 (comparing "price" and "delivery"). But in any

33

event, SB 5981 relates to "the distribution and delivery of 340B drugs to covered entities." 1-NovER-36. In fact, Appellants' own policies refer to the delivery of 340B drugs. *E.g.*, 5-AbbVieER-890 (linking to policy available at https://tinyurl.com/3pw7t8nk that states "Your covered entity should place orders for delivery to your covered entity's in-house outpatient pharmacy"). Additionally, Novartis merely cites an express preemption case unrelated to the presumption against preemption. *See Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2005 (2026).

For these reasons, the district court did not abuse its discretion in finding that the presumption against preemption applies here. However, even if this heightened presumption does not apply (it does), Appellants still fail to meet their burden on their preemption claims.

### b. Congress has not occupied the field under any definition

Appellants are unlikely to succeed on their field preemption claim. Field preemption is "rare." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). Here, neither form of field preemption is present: (1) there is no federal interest so dominant that the federal system precludes enforcement of state laws on the same subject; and (2) federal law does not create a framework of regulation so pervasive that

34

Congress left no room for states to supplement it. *See Arizona v. United States*, 567 U.S. 387, 399 (2012).

As an initial matter, the relevant field is the distribution of drugs by pharmacies (i.e., the practice of pharmacy), which is consistent with other courts' analyses of similar state laws. *See McClain*, 95 F.4th at 1143 (examining the field of the "practice of pharmacy"); *see also Murrill*, 2026 WL 1947948, at *5-7 (evaluating the field of "the distribution of drugs to patients" and "the role of pharmacies in this distribution"). Appellants argue the field is "manufacturers' obligations under the federal 340B program." 1-NovER-35-36. As the district court explained, even if the Court accepts Appellants' definition of the field, there is no preemption here. 1-NovER-34-37.

### i. There is no dominant federal interest

The district court correctly concluded that "there is no dominant federal interest" in drug distribution, and there is no dominant federal interest in manufacturers' 340B obligations either. *Id.* "[E]very subject that merits congressional legislation is, by definition, a subject of national concern," but "[t]hat cannot mean, however, that every federal statute ousts all related state law." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). Therefore, a court must assess "special features warranting pre-

35

emption": (1) whether the "supremacy of the national power" is "made clear by the Constitution," such as in the case of foreign affairs; and (2) whether regulation of the field is "intimately blended and intertwined with responsibilities of the national government." *Id.*

Here, there is no exclusive federal power over the distribution of drugs (or even the 340B program), nor are these issues intimately blended and intertwined with the national government's responsibilities. Instead, "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Id.* (citation omitted); *see also Wyeth*, 555 U.S. at 578-79 (recognizing traditional role of state law in drug regulation).

Appellants' reliance on *Astra*—which Appellants concede is "not a preemption case"—is misplaced. Dkt. #21.1 at 47 (citing *Astra*, 563 U.S. 110). *Astra* merely addressed whether private parties may bring pricing lawsuits relying on "federal common law." 563 U.S. at 118. But whether private parties may sue to enforce a federal provision regarding 340B drug pricing is irrelevant. *See Davidson v. Sprout Foods, Inc.*, 106 F.4th 842, 850 (9th Cir. 2024) (explaining that a federal statute's "prohibition of private enforcement" is not evidence of any intent to preempt "private enforcement of [a] state law" that incorporated federal standards), *cert. denied*, 145 S. Ct. 1922 (2025).

36

Additionally, "while Congress sought national uniformity with respect to the pricing obligations imposed by Section 340B" there is no evidence that Congress sought uniformity for "delivery and distribution." *Lopez*, 2026 WL 497141, at \*15. In fact, just a few years after Section 340B was enacted, HRSA stated that "it is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities." 1996 Guidance, at 43549; *see also Sprietsma v. Mercury Marine, a Div. of Brunswick Corp*., 537 U.S. 51, 70 (2002) (explaining that "the concern with uniformity does not justify the displacement" of state law, especially where the federal agency changed positions). Nor have Appellants cited any case law that any such uniformity would qualify as a dominant federal interest in this field. It would not. *See Fitch*, 152 F.4th at 646-47. Moreover, Congress's "balance among a variety of interests" is not unique to Section 340B; it occurs "with any piece of legislation." *Whiting*, 563 U.S. at 606.

For this basic reason, Appellants' other case citations do not support their argument. *See Nat'l Fed'n of the Blind v. United Airlines Inc*., 813 F.3d 718, 724 (9th Cir. 2016) (an "exhaustive" federal regulatory scheme in "the field of aviation," in which preemption is "more readily inferred"); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471-72 (9th Cir. 2007) (citation modified) ("regulation

37

of this country's airspace has a *history* of significant federal presence" and relates to "national security"); *Arizona*, 567 U.S. at 394, 402 (preemption with respect to the "broad, undoubted power" over "the subject of immigration"); *Ventress v. Japan Airlines*, 747 F.3d 716, 722 (9th Cir. 2014) (pilot safety); *Chae v. SLM Corp.*, 593 F.3d 936, 944-45 (9th Cir. 2010) (Congress instructed the federal agency to regulate "all aspects of the loan process"); *Boyle*, 487 U.S. at 511-12 (military equipment).

### ii.     There is no pervasive regulation

The district court also correctly held that there is no framework of federal regulation so pervasive that Congress left no room for states to supplement it. 1-NovER-34-37. Instead, the opposite is true: all parties and four federal circuit courts agree that Section 340B is silent on the distribution of 340B drugs by contract pharmacies. *Sanofi Aventis*, 58 F.4th at 703; *Johnson*, 102 F.4th at 460; *McClain*, 95 F.4th at 1143; *Fitch*, 152 F.4th at 646.

To start, Section 340B only has a "few" substantive requirements, which relate to how the price discount is calculated, the prohibition on duplicate discounts and diversion, and the enforcement of those provisions. *Supra* §III.A. Section 340B does not mention how 340B drugs are distributed to patients. Additionally, this issue is not within HHS's rulemaking authority. *See* 42 U.S.C.

38

§256b(d)(1)(B)(i), (1)(B)(vi), (3); *see also* Dkt. #26.1 at 14; *see also Pharm. Rsch. & Mfrs. of Am. v. Dep't Health & Human Servs.*, 43 F. Supp. 3d 28, 42 (D.D.C. 2014).

Appellants' own statements confirm this silence (and thus, lack of pervasive regulation) on the distribution of 340B drugs by contract pharmacies. For example, PhRMA has represented that Section 340B does "not speak to what distribution systems" can be used and "*does not compel any particular outcome with respect to covered entities' use of pharmacies*." 2-NovER-276 (emphasis added). Similarly, Novartis has represented that Section 340B is "completely silent" on "contract pharmacy arrangements." 2-NovER-219.

"Silence, without more, does not preempt—a clear and manifest purpose of pre-emption is always required." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1143 (9th Cir. 2015) (citation modified). Appellants' claim that Section 340B's silence is a decision by Congress not to mandate certain actions "turns the presumption against preemption on its head" because "absent an affirmative indication to the contrary, a federal regulation will not preempt state law." *City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1160 (9th Cir. 2017). Here, "Congress was aware of the role of pharmacies and state pharmacy law in implementing 340B. Therefore, Congressional silence on pharmacies in

39

the context of 340B indicates that Congress did not intend to preempt the field."
*McClain*, 95 F.4th at 1144. There cannot be pervasive regulation of the distribution of 340B drugs by pharmacies if the relevant federal statute is completely silent on the subject, a conclusion this Court has affirmed in the 340B context before. *See AIDS Healthcare Found. v. Douglas*, 457 F. App'x 676, 678 (9th Cir. 2011) ("no indication that Congress intended to occupy the whole field" affecting 340B double discounts); *see also Avenal Cmty. Health Ctr. v. Baass*, No. 23-16109, 2024 WL 4441430, at *2-3 (9th Cir. Oct. 8, 2024) (no field preemption of 340B duplicate discount regulations).

AbbVie seeks to distract from the federal statute's silence by arguing—for the first time on appeal—that HHS characterizes the 340B program as "related to drug pricing and drug distribution." Dkt. #18.1 at 19 (citing ADR Rule, 89 Fed. Reg. 28643). Even setting aside AbbVie's failure to raise this argument earlier, HHS's general characterizations of the 340B program do not show that federal statutes pervasively regulate how 340B drugs are distributed to patients. *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 371, 395 (2024)

(court should "independently interpret the statute and effectuate the will of Congress subject to constitutional limits").[8]

### iii. Spending Clause legislation does not have greater preemptive effect

Having failed to establish either form of field preemption (i.e., a dominant federal interest or pervasive regulation), Appellants invent a new preemption analysis contradicted by Supreme Court precedent. Appellants inaccurately claim that private drug manufacturers entered a "bargain" as part of a federal Spending Clause program that allowed them to impose the conditions that SB 5981 prohibits. Dkt. #21.1 at 53-54; Dkt. #18.1 at 47-50; Dkt. #16.1 at 47-49.

Spending Clause legislation is not entitled to greater preemptive effect than laws enacted under other enumerated powers. The Supreme Court employs the same preemption analysis regardless of whether a federal statute was enacted under Congress's Spending Clause power or some other authority. *See, e.g.*, *Walsh*, 538 U.S. at 666-67 (conducting a standard preemption analysis and not

---

[8] Similarly, Novartis briefly argues that HHS oversees distribution via the "Prime Vendor Program" run by "Apexus." Dkt. #21.1 at 49 n.8, 52. But the Prime Vendor Program relates to how covered entities receive the drugs, not patients, and "Congress could have included similar language for contract pharmacies but did not." *Sanofi Aventis*, 58 F.4th at 704. Novartis's citation to *In re Derailment Cases*, which involved express preemption, is inapplicable. 416 F.3d 787, 792-93 (8th Cir. 2005).

41

mentioning the Spending Clause as relevant); *see also St. Luke's Health Sys., Ltd. v. Labrador*, 782 F. Supp. 3d 953, 978-79 (D. Idaho 2025) (collecting cases and describing "the Supreme Court's long-held understanding that ordinary preemption principles apply to Spending Clause legislation"); *Citizens for Honesty & Integrity in Reg'l Plan. v. County of San Diego*, 258 F. Supp. 2d 1132, 1137 (S.D. Cal. 2003) ("[I]f a private citizen could bind unconsenting States to the terms of legislation enacted under the Spending Clause, then the concept of federalism would be a dead letter."), *vacated for lack of jurisdiction*, 399 F.3d 1067, 1068 (9th Cir. 2005). The fact that "Congress enacted Section 340B pursuant to its spending power does not change the analysis" because that would improperly "graft a stricter preemption standard onto spending-power legislation." *Murrill*, 2026 WL 1947948, at *8 n.68.

Appellants fail to cite any Ninth Circuit or Supreme Court case law suggesting otherwise, instead citing cases that never even mention preemption. *See Stanley v. City of Sanford*, 606 U.S. 46 (2025); *Barnes v. Gorman*, 536 U.S. 181 (2002); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022); *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025). Appellants also cite a case in which the Supreme Court confirmed that the Spending Clause legislation at issue *did not* affect states' ability to directly regulate the private

42

conduct at issue. *See Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1938, 1952 n.4 (2026). AbbVie and PhRMA also cite *Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003), in which a state sought to force the federal government to take action it had chosen to terminate, whereas "[n]o such direct conflict is present in this case, because SB 5981 is not altering the relationship between the manufacturers and HRSA; rather, it … merely regulates the relationship between private parties." 1-NovER-39. Additionally, there is no need to consider the Eighth Circuit's decision in *Forest Park II* when the Eighth Circuit has explicitly opined on the same question presented here. *See McClain*, 95 F.4th at 1139-40 (rejecting all of PhRMA's preemption arguments with respect to a state law similar to SB 5981).

The Fourth Circuit's now-vacated *McCuskey* decision is equally unhelpful to Appellants. 1-NovER-29-34 (citing *McCuskey*, 171 F.4th at 689). *McCuskey* is a stark outlier that applied an inaccurate legal standard. 171 F.4th at 689-96; *see also* 1-NovER-30. Strangely, *McCuskey* concluded the state law is preempted because it specifically targets a federal program and because Section 340B is spending-power legislation. 171 F.4th at 695 n.12. As noted above, *McCuskey*'s flawed analysis is particularly inapt in the Ninth Circuit where the

43

doctrines of preemption and intergovernmental immunity are "distinct" and should be "accurately distinguish[ed]." *California*, 921 F.3d at 880, 884 n.9.

### c. There is no conflict preemption

Appellants are also unlikely to succeed on their obstacle preemption claim. Obstacle preemption occurs when a state law "conflicts with federal law" by "standing as an obstacle to the accomplishment and execution of the full purposes and objectives" of Section 340B. *Arizona*, 567 U.S. at 399 (citation modified). A plaintiff claiming obstacle preemption "faces a high bar," because "the mere fact that there is tension between federal and state law is not enough." *CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1274 (9th Cir. 2021) (citation modified). Instead, there must be a showing of "irreconcilability between state and federal law." *Id.* (citation modified).

Here, SB 5981 and Section 340B are not "irreconcilable." Instead, they have distinct requirements that are aimed at the same purpose of helping covered entities serve low-income patients. Section 340B and SB 5981 "can both easily be complied with[,]" and SB 5981 would not "hinder" Section 340B's implementation. *AIDS Healthcare*, 457 F. App'x at 678; *Avenal*, 2024 WL 4441430, at *3.

44

### i. SB 5981 regulates activities that federal law does not

Appellants incorrectly argue that Section 340B's silence on delivery somehow preempts states from regulating 340B drug delivery. However, this argument fundamentally misunderstands the "basic premise" of preemption, in which statutory silence is insufficient. *See City of Los Angeles*, 854 F.3d at 1160; *see also supra* §VI.A.2.b. In other words, there is no preemption "if the Government was silent about the conduct that allegedly violated state law." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1095 (2026).

A state law is not preempted when it merely imposes requirements "beyond those contained" in the Public Health Service Act (like Section 340B) or its accompanying regulations. *Hillsborough*, 471 U.S. at 710. In fact, even when a federal statute *explicitly prohibits* the federal agency's imposition of a particular requirement—which is surely not the case here—a state is not preempted from imposing the same requirement. *See Whiting*, 563 U.S. at 608-09 (concluding state law concerning a federal program was not preempted where the federal law "contain[ed] no language circumscribing state action" though the federal agency was prohibited from imposing the mandate contained in the state law). Here, the issue is simpler: Section 340B is entirely silent on the issues of contract pharmacies and providing claims data to manufacturers.

45

Given that over twenty states have enacted laws similar to SB 5981 over several years and Congress has not enacted any new legislation, "[t]he case for federal pre-emption is particularly weak" because Congress is aware of state law in this field "and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 575 (Congress remained silent and would have been aware of state action).

In arguing otherwise, Appellants cite inapposite cases in which a federal statute or regulation explicitly permitted the conduct at issue—not cases involving congressional silence. *E.g.*, *Sperry v. Florida ex rel. Fla. Bar*, 373 U.S. 379, 385 (1963) (federal statute "expressly permits" and federal Commissioner "explicitly granted" authority); *Barnett Bank of Marion Cnty. v. Nelson*, 517 U.S. 25, 31 (1996) (federal statute expressly "provid[ed], without … qualification" that national banks "may" act as agents); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154-55 (1982) (federal regulation "plainly provides" that the entity "continues to have the power" the state seeks to restrict); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (federal regulation imposed a gradual phase-in of passive restraints, which state torts claim contradicted); *Lawrence County*, 469 U.S. at 260-61 (federal law directly granted the authority that the state law restricted); *Whistler Invs., Inc. v.*

46

*Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1166-67 (9th Cir. 2008) (federal law directed federal commission to regulate clearing agencies, and federal commission approved the exact clearing agency program that the state-law claim sought to challenge); *Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (Congress "explicitly" provided safe harbor for activities the state sought to punish).

Similarly, as the district court explained, Appellants' citation to *McDaniel v. Wells Fargo Investments, LLC*, 717 F.3d 668 (9th Cir. 2013) is inapplicable because that federal law imposed "affirmative, supervisory duties" whereas state law eliminated those supervisory methods. 1-NovER-41-42. Here, Appellants' policies are not based on "some *affirmative duty* imposed by federal law." *Id.* Neither does *Maine Forest Products Council v. Cormier* support Appellants as that state law forbid employment of "the very same laborers whom federal law authorizes to work" pursuant to "elaborate statutory and regulatory criteria." 51 F.4th 1, 10 (1st Cir. 2022). Here, there are zero criteria—let alone elaborate criteria—in the federal statute and regulations for contract pharmacies and claims data.

Seeking to escape the straightforward conclusion that state laws may address what federal law does not, Appellants also argue that SB 5981 regulates

47

more than the delivery of the drugs because it also includes the term "acquisition." *See* SB 5981 §§3(1)-(2). This is just a word game. Section 340B is also silent on whether manufacturers may limit the "acquisition" of 340B drugs by imposing the conditions at issue. In fact, PhRMA concedes that "the statutory (and contractual) text is 'silent' about the conditions manufacturers may impose on their 340B offers." Dkt #16.1 at 58. In any event, the district court correctly held that SB 5981 includes the terms "acquisition" and "delivery" due to covered entities' common use of the replenishment model, in which covered entities are reimbursed after-the-fact for drugs once they have already been dispensed to patients. 1-NovER-45-46 (describing similar court orders in other states). The legislature was merely "employ[ing] a belt and suspenders approach[,]" making the statute "somewhat redundant" to ensure that the various policies of all manufacturers would be covered. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020).

Appellants' remaining arguments likewise fail. Novartis cites two cases that found *no preemption*. *See Knox v. Brnovich*, 907 F.3d 1167, 1180 (9th Cir. 2018); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207-12 (1983). Novartis also notes that in a separate statute (not Section 340B), Congress required the sale of other drugs through contract

48

pharmacies. *See* Dkt. #21.1 at 56. This may show that Section 340B itself does not require manufacturers to allow covered entities to use contract pharmacies, but cannot serve as a basis to preempt state law. Similarly, the HRSA decision letter cited by Novartis merely states that the panel must "factor in any binding judicial decisions" and then cites the D.C. Circuit's decision, which held that federal law is silent on the issues of contract pharmacies and claims data. 4-NovER-634-636; *Johnson*, 102 F.4th at 460. Finally, AbbVie's suggestion that Section 340B's requirement that AbbVie "offer" discounted drugs to covered entities somehow indicates states cannot regulate delivery strains credulity. Dkt. #18.1 at 44.[9]

### ii. SB 5981 does not invite conflicting adjudications

The district court also correctly rejected Appellants' claim that SB 5981 resulted in conflicting enforcement schemes. Put simply, enforcement of SB 5981 is "aimed at activity that falls outside the purview of 340B." *McClain*, 95 F.4th at 1145. HRSA's ADR process is limited *only* to claims by covered entities that they have been overcharged or claims by manufacturers about

---

[9] AbbVie also argues that "inaction joined with action" can raise a preemptive inference where Congress has otherwise created a comprehensive regulatory scheme. Dkt. #18.1 at 48 (quoting *Arizona*, 567 U.S. at 406-07). But the premise of this argument is faulty. As shown above, there is no comprehensive scheme here. *See supra* §VI.A.2.b.

duplicate discounting or diversion. 1-NovER-47-48 (citing 42 C.F.R. §10.21(a)).

Separately, SB 5981 imposes penalties for *state* law violations, which is when

manufacturers "interfer[e] with the distribution of Section 340B drugs" by

"contract pharmacies" or require claims data. *Fitch*, 152 F.4th at 647-48. In other

words, SB 5981 "creates state law obligations" that "operate[] alongside, rather

than in place of, the federal enforcement regime." *Lopez*, 2026 WL 497141, at

*13-15. Therefore, SB 5981 is not an obstacle to the 340B enforcement scheme.

*Id.*; *McClain*, 95 F.4th at 1145; *Murrill*, 2026 WL 1947948, at *7. This is

consistent with the Supreme Court's instruction that there is ordinarily no

preemption solely because a state "impose[s] liability over and above that

authorized by federal law." *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 89 (1990).[10]

"Far from frustrating § 340B's objectives, the two laws work in tandem

to advance Congress's central aim: ensuring that manufacturers participating in

Medicaid offer discounted drugs to covered entities, dominantly, local facilities

that provide medical care for the poor." *Murrill*, 2026 WL 1947948, at *8

---

[10] For the same reason, Novartis's citation to cases where "two separate remedies are brought to bear *on the same activity*" is equally inapplicable. *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (emphasis added); *see also Arizona*, 567 U.S. at 387-91 (federal and state laws both included penalties for unauthorized employees). SB 5981's remedies do not apply to an activity also regulated by the federal government.

(citation modified). In other words, SB 5981 "assists in fulfilling the purpose of 340B … There is no obstacle for pharmaceutical manufacturers to comply with both [SB 5981] and Section 340B." *McClain*, 95 F.4th at 1145.

Appellants' argument that HRSA would police the same conduct as the State *explicitly contradicts* Appellants' prior positions and four circuit court holdings that HRSA lacks this exact authority. *E.g.*, *Johnson*, 102 F.4th at 464 (rejecting HRSA's efforts to require Novartis and other manufacturers to deliver 340B drugs to an unlimited number of contract pharmacies and to refrain from requiring claims data). HRSA's authority over 340B "overcharge claims" does not include contract pharmacy restrictions. *Id.* at 459, 464; *Sanofi Aventis*, 58 F.4th at 701, 706. Novartis itself previously stated that: "[u]nder Novartis's policy, when an order is made through a non-qualifying contract pharmacy arrangement, the order is declined" such that a "*covered entity is not charged any price, let alone overcharged.*" 2-NovER-295, 303 (emphasis added). In other words, HRSA enforces overcharges, but covered entities are not charged anything at all if a manufacturer refuses to deliver a 340B drug to a contract pharmacy. *Id.*; *see also* 5-AbbVieER-890 (linking to AbbVie policy available at

51

https://tinyurl.com/3pw7t8nk that states AbbVie will "decline" 340B orders to unpermitted contract pharmacies).[11]

Whether a manufacturer has "limited [a] covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price[,]" is *only considered* in HRSA's ADR process in the context of whether there has been an overcharge. 42 C.F.R. §10.21(a)(1). And as described above, multiple circuit courts have already concluded that HRSA's authority does not include the distribution of 340B drugs to contract pharmacies and manufacturers' claims data requirements. *Sanofi Aventis*, 58 F.4th at 703; *Johnson*, 102 F.4th at 464; *Murrill*, 2026 WL 1947948, at *8; *McClain*, 95 F.4th at 1145.

Novartis and PhRMA attempt to distract from the separate enforcement schemes by arguing that SB 5981 would only apply to covered entities and 340B drugs, as those terms are defined by the federal statute. Dkt. #21.1 at 64-65; Dkt. #16.1 at 64-65. But a state law's incorporation of federal definitions does not, on its own, establish conflict. *See Davidson*, 106 F.4th at 844; *see also*

---

[11] AbbVie claims the American Hospital Association viewed contract pharmacy restrictions as overcharges. Dkt. #18.1 at 57. However, HRSA *elected not to adopt* this recommendation from the American Hospital Association that HRSA "explicitly state in its final rule that the ADR process is an available forum for affected 340B hospitals to seek redress from these restrictions targeted to community and specialty pharmacies." *See* 3-AbbVieER-394-395; *see also* 42 C.F.R. pt. 10 (final rule).

*AbbVie, Inc. v. Skrmetti*, No. 3:25-cv-00519, 2026 WL 542712, at *11 (M.D. Tenn. Feb. 26, 2026) ("[T]he fact that the Act may" involve states "constru[ing] terms used in federal statutes and regulations does not suggest preemption"). In fact, the Supreme Court has held that the use of federal definitions in a state statute weighs *against* conflict preemption, describing a state as having gone "the extra mile" to avoid a conflict by using the same definitions as a federal statute. *Whiting*, 563 U.S. at 601.

Novartis's speculation about potential enforcement scenarios also fails because it applies the wrong standard. Because Appellants are facially challenging SB 5981 as unconstitutional, Appellants "must establish that *no* set of circumstances exists under which [the state law] would be valid." *Mont. Med. Ass'n v. Knudsen*, 119 F.4th 618, 624 (9th Cir. 2024) (emphasis added). Yet, Novartis improperly seeks to flip this standard by showing *a single* potential circumstance under which SB 5981 is allegedly invalid. *See* Dkt. #21.1 at 66-67. The Ninth Circuit "proceed[s] with caution because facial challenges often rest on speculation and raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Knudsen*, 119 F.4th at 624. Novartis's speculative "What if" questions about enforcement show, at best, "the existence of a hypothetical or potential conflict" that is "too speculative" to "justify

53

preemption" such that there is no "obstacle" between the federal and state laws, whether "facially or in any specific case." *Id.* at 625; Dkt. #21.1 at 66-67.

Additionally, AbbVie's claim that "multiple federal courts have enjoined state contract-pharmacy laws as preempted" (Dkt. #18.1 at 55) due to alleged enforcement issues ignores that the *vast majority* of federal courts considering this issue have held that similar state laws are *not* preempted. *See* 2-AbbVieER-187. Moreover, the few outlier cases cited by Appellants are based on legal and factual errors. *See AbbVie, Inc. v. Drummond*, 808 F. Supp. 3d 1266, 1276-77 (W.D. Okla. 2025) (improperly characterizing the state law as "expand[ing] the definition of 'covered entity' to include contract pharmacies[.]"); *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 457 (S.D.W. Va. 2024) (incorrectly focusing its analysis on "the price … the manufacturer can charge" rather than the delivery of drugs by contract pharmacies), *aff'd sub nom. McCuskey*, 171 F.4th 674; *AbbVie, Inc. v. Wrigley*, 2026 WL 1133457, at *7-10 (D.N.D. Apr. 27, 2026) (failing to follow Eighth Circuit precedent and finding a state law distinct because it imposed criminal penalties, unlike here).

Appellants' other case citations are also inapplicable. Novartis and AbbVie cite *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 374

54

(2000), but there the federal law specifically allowed the President to waive sanctions the state law sought to impose. And AbbVie's citation to *Gartrell Construction Inc. v. Aubry*, 940 F.2d 437, 438-41 (9th Cir. 1991) is inapposite as AbbVie is not a federal contractor "performing work exclusively for the federal government" (*see supra* §VI.A.1), nor is Washington seeking to change the federal government's "determination" of a particular entity's qualifications. Appellants' citations to *Astra*, *Buckman*, *Ventress*, and *Valle de Sol* are inapplicable for the reasons described above. *Supra* §VI.A.2.[12]

### iii. SB 5981 does not obstruct 340B audits

Appellants' speculation that SB 5981's claims data provision could interfere with their ability to conduct Section 340B audits does not meet their burden to show state law is preempted. First, SB 5981 cannot be an obstacle to Section 340B because its claim data provision applies "unless federal law requires such data sharing." SB 5981 §3(2). And, moreover, "[p]laintiffs have

---

[12] PhRMA vaguely speculates that SB 5981's reporting requirements could be an obstacle to Section 340B because Washington could "potentially reverse engineer" its pricing information. Even if this concern was more than pure speculation (it is not), Section 340B discusses the confidentiality of HHS's 340B pricing *website* and focuses on whether website information could be redisclosed. 42 U.S.C. §256b(d)(1)(B)(iii). In any event, SB 5981 directs the State to aggregate data to avoid revealing information from specific manufacturers in reports. *See* SB 5981 §11(1)(b)(i).

not provided record evidence to show that the provision of claims data alone is necessary to satisfy the reasonable cause standard. Neither do they present evidence that they have ever been denied the ability to conduct an audit upon request, nor that they have been required by HRSA to submit this type of claims data to bolster a request for an audit." 1-NovER-50.

Manufacturers can easily establish reasonable cause for an audit in the absence of a covered entity's claims data. For example, HRSA (the agency that approves audit requests) has published guidance that "[s]ignificant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity may be a basis for establishing reasonable cause." Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 Fed. Reg. 65406; *see also* 2-NovER-173 (it is common for good-faith inquiries from drug manufacturers to be "based on changes in purchasing volume, not claims data").

According to HRSA, the "reasonable cause" necessary for an audit is "not overly burdensome" and does not "present any barriers to a manufacturer's ability to perform an audit of a covered entity." *See* ADR Rule, 89 Fed. Reg. at 28646; *see also* 2-NovER-173 ("HRSA does not have stringent criteria for approving manufacturer audits"). Recent history confirms as much: as of 2024,

56

HRSA had not denied a request for a manufacturer audit of a covered entity in the preceding five years. ADR Rule, 89 Fed. Reg. at 28646.

Historical context about the audit process further confirms that claims data is not necessary for HRSA to approve a manufacturer's audit request. Appellants only started requiring covered entities to provide claims data in 2020 or later, but the 340B program and audits have existed since the 1990s. *See* 1996 Guidance (discussing manufacturer audit guidelines in 1996); 4-NovER-543-46, 584-91 (Novartis only began *requiring* claims data in 2025); 1-PhRMAER-111-12 (PhRMA member Bristol Myers Squibb only began requiring claims data in March 2022); *Johnson*, 102 F.4th at 458 (manufacturers began requiring claims data in 2020).[13] Moreover, the fact that Novartis only requires certain covered entities—but not all—to provide claims data underscores the point that claims data is unnecessary for manufacturers to justify audits in the first place. *See* 4-NovER-584-91 (exempting federal grantees from restrictions). The ADR system "has been functioning adequately since its inception" without any

---

[13] Thus, AbbVie's baseless claim that manufacturers have always had access to claims data is incorrect. Dkt. #18.1 at 66. And AbbVie's equally unsupported assertion that claims-data requirements create no administrative burdens is directly contradicted by the record. *E.g.*, 3-NovER-431-32 (describing significant administrative burden); 3-NovER-401 (same); 3-NovER-393 (same); 3-NovER-346 (same); 2-NovER-335 (same); 2-NovER-321-27 (same).

57

statutory requirement that covered entities provide claims data to drug manufacturers. 1-NovER-50.

Additionally, SB 5981 does not prevent manufacturers from asking covered entities for claims data for disputed drug reimbursement claims. Instead, SB 5981 simply prevents manufacturers from requiring covered entities to provide claims data "as a condition for allowing" the delivery of 340B drugs. SB 5981 §3(2). Drug manufacturers have significant financial incentives for obtaining covered entities' claims data that are unrelated to covered entities' Section 340B compliance, such as manufacturers seeking to deny commercial rebate requests from pharmacy benefit managers. 2-NovER-170-71. And manufacturers continue to expand the scope of their claims data requirements in real time. *E.g.*, 2-NovER-326-27. Although PhRMA suggests that the declaration from PhRMA member Gilead Sciences, Inc. demonstrates a need for claims data, Gilead Sciences only started requiring claims data in March 2022. 1-PhRMA-118-21. Moreover, Gilead acknowledges that HRSA has "approved audits" that Gilead requested before 2022 and instead takes issue with the 340B "audit process" as a whole, which has nothing to do with SB 5981. *Id.*

AbbVie and PhRMA also argue that HRSA's 1994 Guidance allows manufacturers to require "standard information" from covered entities, but they

58

provide no evidence that requiring claims data would be "standard" given that manufacturers have only recently imposed these requirements. Dkt. #18.1 at 65-66; Dkt. #16.1 at 60. Instead, HRSA's 1994 Guidance explicitly stated that a "manufacturer may not condition the offer of statutory discounts upon" a covered entity "submitting information related to drug acquisition, purchase, and inventory systems." 1994 Guidance, at 25113-14.[14]

Finally, PhRMA's related (and brief) suggestion that manufacturers need to require claims data to avoid duplicate Medicare price reductions under the Inflation Reduction Act also lacks merit. The Center for Medicare & Medicaid Services already requires pharmacies to provide drug manufacturers with the specific data that manufacturers use to avoid duplicate Medicare discounts. 2-AbbVieER-204 n.9. Therefore, there is no reason why manufacturers would need to require covered entities to submit broad claims data for this same purpose.

---

[14] Novartis states that manufacturer audit reports were infrequent between 2022 and 2024, but this is both: (1) irrelevant to whether claims data is necessary to establish reasonable cause for an audit; and (2) ignores the fact that audit reports may be low due to HRSA's "comprehensive" efforts to "ensure compliance" and facilitation of "good faith resolution efforts … without need for formal intervention." 89 Fed. Reg. at 28644-45.

#### iv.    SB 5981 is not an obstacle to Medicaid and Medicare

Novartis is also unlikely to succeed on its claim that Congress wanted to avoid state-level 340B requirements because manufacturers might opt out of Medicaid and Medicare Part B due to the costs of participating in federal healthcare programs. As the district court explained, this is "speculative." 1-NovER-46. Novartis fails to provide any basis for believing SB 5981 could actually cause manufacturers to disenroll from these massive federal programs. Dkt. #21.1 at 63-64.

The fact that state law "may" result in a "modest impediment" to the Medicaid program "does not provide a sufficient basis for pre-emption." *Walsh*, 538 U.S. at 667. And Novartis's argument is contradicted by the fact that Congress *already allows* states to affect manufacturers' costs of participating in federal healthcare programs, and states already do so. Indeed, Congress subjects Medicaid participants "not just to its own conditions, but to special state-law obligations or enforcement actions too." 1-PhRMAER-152.

#### v.    The United States' amicus brief is unpersuasive for the same reasons

The United States' amicus brief repeats many of Appellants' faulty preemption arguments and therefore contains the same flaws as Appellants' motions. Dkt. #26.1. Importantly, the United States' amicus brief is a complete

and unexplained about-face from the federal government's positions over the last two decades that: (1) Section 340B permits or requires covered entities to have the option of using contract pharmacies for 340B drug distribution; and (2) manufacturers cannot condition the delivery of 340B drugs on a covered entity submitting claims data. *Supra* §III.B. The district court therefore did not abuse its discretion in finding the United States' novel position unpersuasive. *See Wyeth*, 555 U.S. at 577-78 (rejecting federal government's recent pronouncement of preemption when it was a reversal of the government's prior longstanding position).

## B.     SB 5981 Is Not a Taking

SB 5981 is also not a taking. The Fifth Amendment prohibits states from taking private property for public use without just compensation. U.S. Const. amend. V; *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021). Violations of the Takings Clause can be a physical taking or a regulatory taking. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002). A physical taking is a "direct appropriation" of property while a regulatory taking occurs when the government imposes a "restriction on the use of property that went too far." *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015)

61

(citation modified). SB 5981 is neither, but AbbVie only challenges the law as a physical taking.

### 1. AbbVie's voluntary participation in the 340B program defeats its takings claim

AbbVie's voluntary participation in the 340B program defeats its takings claim. The district court did not abuse its discretion because Ninth Circuit precedent supports this conclusion, which AbbVie notably ignores.

There is no compelled taking of property when a party "voluntarily choose[s] to participate." *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1224 (9th Cir. 2018). In other words, the government isn't "taking" anything if the regulated entity can opt out and keep its property.[15] This includes voluntary participation in a heavily regulated program or activity subject to changing conditions. *See Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1241 (9th Cir. 2013). The voluntary participation doctrine applies even if requirements are enacted after the property owner elected to participate, because regulated entities participating in government programs "can hardly expect" that requirements "will never change." *Id.* at 1252.

---

[15] And participation in a program is still voluntary even if "business realities effectively dictate participation." *Va. Hosp. & Healthcare Ass'n v. Roberts*, 671 F. Supp. 3d 633, 666 (E.D. Va. 2023) (citation modified).

Comparing this Court's decisions in *Managed Pharmacy Care* and *Sierra Medical* illustrates why AbbVie's claim fails. In *Managed Pharmacy Care*, this Court rejected the plaintiff's takings claim because "participation in Medicaid is voluntary." 716 F.3d at 1252. By contrast, in *Sierra Medical*, there was no voluntary participation because there was no way for the plaintiffs to opt out; if the plaintiffs had "unenrolled" from the program, the state law "would continue to apply to them indefinitely." 883 F.3d at 1224-25. This case is like *Managed Care*, not *Sierra Medical Services*. AbbVie can opt out. If AbbVie withdrew from the 340B program, SB 5981 would no longer apply to it, and the supposedly compelled sales that AbbVie complains of would not occur. 1-NovER-54-55.

When assessing whether voluntary participation defeats a party's takings claim, this Court does not use the tit-for-tat approach that AbbVie advocates for in which an incremental benefit is needed for each additional requirement. Instead, this Court takes a holistic approach, looking at whether participation in the program *as a whole* is required and the foreseeability of the conditions for participating in it changing. *See Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 835-37 (9th Cir. 2025) (contrasting the "highly regulated" pharmaceutical market with the "materially different" market of raisin growing); *see also Managed Pharmacy Care*, 716 F.3d at 1252 (evaluating likelihood of program

63

requirements changing). As the district court emphasized, AbbVie does not explain why new regulatory conditions must be accompanied by a separate benefit to maintain the voluntary nature of the program. 1-NovER-55.

The two out-of-circuit cases AbbVie dredges up do not save its claim. The question in *Virginia Hospital & Healthcare Association v. Roberts*, 671 F. Supp. 3d 633, 665-66 (E.D. Va. 2023) was whether state law requirements compelled participation in the federal program—aligning with this Court's approach—and not whether it compelled the alleged property transfer. *Id.* at 666 ("[T]he issue with Plaintiffs' argument is that those *state law* … requirements have no bearing on whether providers' participation in Medicaid and Medicare are voluntary as a matter of *federal* law."). As to *Valancourt Books, LLC v. Garland*, 82 F.4th 1222, 1232 (D.C. Cir. 2023), that takings challenge succeeded because the claim did not involve a voluntary program whatsoever. Instead, the government benefit (copyright protection) was given in an "instant and automatic" way without "any affirmative step" needed to opt in. *Id.* at 1232-33. Illustrating this distinction, the D.C. Circuit suggested that if there was a way to opt out of the benefit, then any property forfeiture would "arguably be voluntary." *Id.* at 1235.

64

### 2. Washington's law does not compel AbbVie to sell its drugs

Another independent reason why there is no taking is that SB 5981 does not "take" anything from anyone. The State is not physically acquiring AbbVie's drugs for itself or others. AbbVie cites *Horne*, which only highlights the lack of a physical taking in this case. There, "[a]ctual raisins" had to be set aside by raisin farmers and "physically segregated" for the government to do with them what it wished. 576 U.S. at 361.[16]

AbbVie incorrectly claims that Washington agrees S.B. 5981 compels AbbVie to sell its property by requiring it to sell more drugs. Dkt. #18.1 at 70. However, SB 5981 does not require AbbVie to make any more sales of 340B drugs than what is required under federal law. *See* 1-NovER-53-54 ("The only 340B sales limits AbbVie alleges it must now exceed are the ones AbbVie has itself imposed."); *see also Sanofi Aventis*, 58 F.4th at 703 (Section 340B does not limit the quantity of 340B drugs that covered entities may order); *Fitch*, 152 F.4th at 643 (no taking). SB 5981 merely requires AbbVie to refrain from restricting how the drugs are distributed to patients. AbbVie's citation to *AbbVie,*

---

[16] AbbVie does not challenge SB 5981 as a regulatory taking, so the Court need not evaluate its likelihood of succeeding on an argument it did not raise. *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009). In any event, SB 5981 fails the fact-intensive regulatory taking test, as other courts have held regarding similar laws. *E.g.*, *Fitch*, 152 F.4th at 644.

65

*Inc. v. Brown*, 809 F. Supp. 3d 1341, 1361 (D. Utah 2025) is inapposite; there, the court found the Utah law expanded the entities eligible for 340B prices, but SB 5981 does not change which covered entities may receive 340B discounts.

### 3. Washington's law serves a public use

Because there is no physical taking of AbbVie's property, this Court, like the district court, need not consider whether the alleged taking is for public use. *Ballinger v. City of Oakland*, 24 F.4th 1287, 1292 (9th Cir. 2022). However, as described in detail below, SB 5981 serves a public use. *Infra* §VI.E. Additionally, because "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use," even if AbbVie has shown a taking occurred, that is not a basis to reverse the district court's denial of a preliminary injunction. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984).

### C. The Dormant Commerce Clause Does Not Bar SB 5981

Novartis's Dormant Commerce Clause claim fails because SB 5981 is not an unlawful extraterritorial regulation. The Constitution gives Congress the power to "regulate Commerce … among the several States," U.S. Const. art. I, §8, cl. 3, and the Dormant Commerce Clause "prevents the States from adopting protectionist measures" that "restrain interstate commerce." *Peridot Tree WA, Inc. v. Wash. State Liquor & Cannabis Control Bd.*, 162 F.4th 1179, 1184 (9th

66

Cir. 2026) (citation modified). Both the Supreme Court and this Court have warned courts to "tread cautiously" and use "extreme caution" when deciding whether to "invalidate state laws under the court-inferred dormant Commerce Clause." *Id.* at 1185 (quoting *Nat'l Pork*, 598 U.S. at 390). The "core" of the Dormant Commerce Clause—an antidiscrimination principle—applies when state legislation discriminates against out-of-state commerce (i.e., when a state law burdens out-of-state competitors to benefit in-state economic interests). *Nat'l Pork*, 598 U.S. at 369.

However, SB 5981 does not discriminate against interstate commerce, and Novartis does not claim that it does (nor could it). That puts Novartis in a "tough spot", *Id.* at 370, because discrimination against interstate commerce "is the focus of the dormant Commerce Clause," *Flynt v. Bonta*, 131 F.4th 918, 928 (9th Cir. 2025) (citing *Nat'l Pork*, 598 U.S. at 369). SB 5981 lacks a "protectionist intent or effect." 1-NovER-53.

In response, Novartis resorts to a Hail Mary. It points to a footnote in *National Pork* that "left open the possibility," *Flynt*, 131 F.4th at 924, that the Dormant Commerce Clause could also be violated by "a law that *directly* regulated out-of-state transactions by those with *no* connection to the State." *Nat'l Pork*, 598 U.S. at 376 n.1. On appeal, Novartis contorts SB 5981 to try to

67

fit through this crevice by claiming SB 5981 "directly" regulates the out-of-state transactions between Novartis and wholesalers. Dkt. #21.1 at 70-71.

Yet, wholesalers are wholly absent from SB 5981. The law places no direct requirements on the transactions between manufacturers and wholesalers. Instead, as the district court correctly found, Washington's law regulates purely intrastate conduct (the distribution of 340B drugs to covered entities in Washington). 1-NovER-52. Federal law, not SB 5981, dictates the prices for 340B drugs. SB 5981 directly regulates the relationship between drug manufacturers *and covered entities* in Washington, not between manufacturers and out-of-state wholesalers. And as the Supreme Court has held, incidentally impacting interstate commerce is not enough to invalidate a law under the Dormant Commerce Clause: in our "interconnected national marketplace," virtually all state laws affect interstate commerce in some way. *Nat'l Pork*, 598 U.S. at 374.

The *Association for Accessible Medicine* cases do not save Novartis's claim. They involved state laws that *directly* regulated out-of-state commerce, not laws with mere incidental extraterritorial impacts. In those cases, both state laws regulated the price of drug sales between out-of-state drug manufacturers and wholesalers. *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666 (4th

68

Cir. 2018); *Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957, 960-61 (8th Cir. 2025). And both state laws, by their very terms, expressly regulated the price charged, in Minnesota by prohibiting an "excessive price increase" Minn. Stat. §62J.842, and in Maryland by prohibiting "price gouging in the sale of an essential off-patent or generic drug." Md. Code Ann., Health-Gen. §2-802 (West). Here, SB 5981 regulates the delivery of drugs to in-state contract pharmacies, not the pricing charged to out-of-state wholesalers.

## D. Appellants Have Not Met Their Burden to Show Irreparable Harm

Appellants primarily depend on the alleged unconstitutionality of SB 5981 to establish irreparable injury. *See* Dkt. #16.1 at 67; Dkt. #18.1 at 83. Yet, Appellants have failed to show that SB 5981 is likely unconstitutional. *See generally supra*. Therefore, Appellants have failed to meet their burden on the injury prong too. *See Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (tenuous allegations of constitutional injury do not support irreparable harm); *Associated Gen. Contactors of Cal., Inc. v. Coalition for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (same).

Their backstop is the asserted economic injury they allege SB 5981 will cause. Dkt. #16.1 at 67; Dkt. #21.1 at 73-74; Dkt. #18.1 at 83. But the district court found that Appellants failed to submit sufficient evidence to show that

69

these potential economic losses were unrecoverable. 1-NovER-62-63 (finding that the alleged injuries were "speculative at this time"). This factual finding is reviewed for clear error. *Supra* §V. Appellants do not even attempt to meet this standard. *See* Dkt. #16.1 at 67; Dkt. #21.1 at 73-74; Dkt. #18.1 at 83. And while the State is protected by sovereign immunity, that does not mean Appellants' alleged losses are unrecoverable. Washington provides a variety of contractual and quasi-contractual causes of action that they may be able to pursue against covered entities should they succeed in striking down SB 5981. *See, e.g.*, *Rekhter v. Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014) (permitting class relief on a claim of breach of the duty of good faith fair dealing following invalidation of a state rule impacting the contract).

## E.     The Balance of the Equities and the Public Interest Weigh Against an Injunction

With respect to the remaining two *Winter* factors, which merge here, Appellants again rely primarily on their merits arguments. Dkt. #16.1 at 67; Dkt. #21.1 at 74; Dkt. #18.1 at 84. Because SB 5981 is constitutional, Washington has a legitimate interest in enforcing its laws. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation modified) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

70

The balance of the equities and public interest both weigh against enjoining SB 5981. Covered entities rely on 340B savings to fund a variety of services for rural, poor, and underserved patients. As just a few examples, UW Medicine uses 340B savings to fund services for individuals experiencing homelessness; to provide trauma-informed care to unhoused women and street-based sex workers; and to provide healthcare for refugees, immigrants, asylum seekers, and survivors of trafficking. 3-NovER-418. Jefferson Healthcare uses 340B savings to fund the only dental office in the county that regularly accepts Medicaid or charity care patients and to fund a reproductive care program in a remote area. 3-NovER-391-92. Summit Pacific uses 340B savings to fund several gastroenterology, cardiology, podiatry, and outpatient infusion services, and a treatment clinic for behavioral health and substance use disorder. 2-NovER-333. And federally qualified health centers (FQHCs) use 340B funds for many purposes, including diabetes education, tobacco cessation programs, support programs for complex behavioral health needs, and mobile medical care for elderly patients and individuals in rural areas. 2-NovER-324-25.

Appellants' restrictive policies harm covered entities and their patients. Contract pharmacies are essential to ensuring access to medications for patients

in remote areas. *E.g.*, 3-NovER-407. They are also crucial for patients who cannot use in-house pharmacies due to insurance requirements or because they need specialty drugs. 3-NovER-345, 409-10, 428, 430.

Appellants' policies also drastically reduce covered entities' revenue, which directly impacts their ability to serve their patients. *E.g.*, 2-NovER-322, 334; 3-NovER-399-400. The financial losses are untenable for most covered entities, which typically operate on razor thin margins or at a loss. 2-NovER-325, 332; 3-NovER-343-44, 391, 412. Those losses are especially harmful now, where rising drug costs, upcoming Medicaid changes, and "unprecedented inflation" will increase financial strain on covered entities. *E.g.*, 2-NovER-324, 332; 3-NovER-390-91, 409.

The district court credited this evidence that "[c]overed entities in Washington provide a range of services to a broad spectrum of under-resourced communities and invest 340B savings in a variety of ways based on the needs of those communities." 1-NovER-5 (quoting record, internal punctuation omitted). Because SB 5981 helps ensure covered entities' financial viability and the provision of essential health services, enjoining it is not in the public interest. *See New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 88 (2d Cir. 2020) (rule that would result in "worse health outcomes" was not in public interest).

72

## VII. CONCLUSION

This Court should affirm the district court's denial of Appellants' motions for preliminary injunction.

RESPECTFULLY SUBMITTED this 4th day of August 2026.

NICHOLAS W. BROWN
Attorney General

*s/ Aliana Knoepfler*
ALIANA KNOEPFLER, WSBA #64738
JULIE MORONEY, WSBA #59017
Assistant Attorneys General
WILLIAM MCGINTY, WSBA #41868
KELLY A. PARADIS, WSBA #47175
Deputy Solicitors General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
aliana.knoepfler@atg.wa.gov
julie.moroney@atg.wa.gov
william.mcginty@atg.wa.gov
kelly.paradis@atg.wa.gov

*Counsel for Defendants-Appellees*
*Nick Brown and Ryan Moran*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-3709, 26-3712, 26-3714

I am the attorney or self-represented party.

**This brief contains** 15,393 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☑ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Aliana Knoepfler   **Date** 8/4/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                            *Rev. 12/01/22*